In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1241

United States of America,

Plaintiff-Appellee,

v.

Laurence Seward,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 851--Blanche M. Manning, Judge.

Argued January 12, 2001--Decided November 15, 2001


  Before Easterbrook, Diane P. Wood, and
Williams, Circuit Judges.

  Diane P. Wood, Circuit Judge.  Until his
death at age 83, Wendell O'Neal was a
boarder in Laurence Seward's house, and,
so he may have thought, a friend of
Seward. After O'Neal died, however,
Seward proved himself to be far less than
a faithful companion. Instead, Seward
embarked on a scheme to appropriate
O'Neal's assets. He began by forging a
number of bank signature cards and using
the cards to transfer funds from O'Neal's
accounts into his own accounts. The
trustee of O'Neal's estate caught on to
what was happening rather soon, but that
did not stop Seward. He promptly forged a
will in which O'Neal supposedly left his
entire estate to Seward, and he attempted
to force the forged will through probate.
Reality overtook him, however, and he was
eventually convicted of one count of bank
fraud in violation of 18 U.S.C. sec.
1344, one count of wire fraud in
violation of 18 U.S.C. sec. 1343, one
count of mail fraud in violation of 18
U.S.C. sec. 1341, and two counts of money
laundering in violation of 18 U.S.C. sec.
1957. The district court sentenced Seward
to concurrent terms of 53 months on each
count and ordered him to pay $209,050 in
restitution. Seward appeals various
aspects of his conviction and sentence.
We affirm Seward's conviction but vacate
his sentence and remand for a new

sentencing hearing.

I

According to Seward, he and Wendell O'Neal were long-time friends and business partners. At the time of his death on June 20, 1994, O'Neal was living in a rented room in Seward's home. O'Neal was not in regular contact with any of his relatives, and at the time of his death Seward was not aware that O'Neal had left a will. After O'Neal died, Seward wasted no time in starting his campaign to steal O'Neal's assets. On the very day O'Neal died, Seward deposited a forged check for $65,000 drawn on O'Neal's account at First National Bank of Chicago (First National) into one of Seward's own accounts. The next day, he presented Bell Federal Savings Bank with forged signature cards that purported to change O'Neal's individual account at that bank into a joint account in O'Neal's and Seward's names. Seward also deposited another forged check drawn on the First National account, this time for $14,000, into one of Seward's own accounts. A few days later, on June 24, Seward opened a joint account in his and O'Neal's names at Commercial National Bank (CNB). He then called Harris Bank, where O'Neal had a certificate of deposit (CD), and, impersonating O'Neal, had the bank transfer the proceeds of the CD to the new joint account at CNB. Finally, on June 30, Seward deposited a cashier's check made out to O'Neal, on which O'Neal's signature had been forged, into a joint account in both their names.

At the same time he was busy appropriating O'Neal's money, Seward notified O'Neal's next of kin, three sisters living in Texas, that O'Neal had died. He waited until June 22 to do so, and even then he merely sent a letter by regular mail. O'Neal's relatives thus learned of O'Neal's death on June 24. On that date, O'Neal's nephew, Carl Taylor, called Seward, and Seward assured Taylor that there was no need to rush to Chicago because Seward was "taking care of things." Nevertheless, Taylor arrived in Chicago on June 28 and advised Seward that he (Taylor) was the executor of O'Neal's will. After a brief investigation into O'Neal's finances, Taylor uncovered Seward's scheme and discovered the fraudulent transfers from

O'Neal's accounts. Through Taylor's quick action, the banks were able to reverse many of Seward's fraudulent transactions, and the estate was able to recover all but $79,050 of the over $260,000 of O'Neal's money that Seward had tried to acquire.

When Taylor first arrived in town, Seward expressed surprise that O'Neal had left a will. One might have thought that Seward would have had the sense to abandon his effort to plunder the estate at that point, but either greed or a lack of good sense kept him going. Noting that the will Taylor had filed was executed in 1983, Seward produced a competing will, purportedly executed in 1989, in which O'Neal left his entire estate to Seward. Seward filed the alleged 1989 will with the probate court, which forced Taylor into a legal battle to defend the 1983 will. Taylor filed motions with the probate court arguing that the 1989 will was a forgery and seeking sanctions against Seward for advancing the false will. Seward filed a response in which he swore that the 1989 will was genuine and attached a copy of the purported will along with several other documents, all apparently forged, which Seward argued demonstrated Seward's close business and personal relationship with O'Neal. Seward also mailed a copy of this pleading and the attached documents to Taylor in Texas, and this mailing formed the basis of the mail fraud count against him.Ultimately, the probate court found that the 1989 will was false, accepted the 1983 will, and ordered Seward to pay $105,000 in legal fees, $25,000 in executor's fees, and $50,000 in punitive damages to O'Neal's estate. This prosecution followed in time, leading to Seward's convictions.

II

On appeal, Seward challenges the sufficiency of the evidence against him on both the mail fraud and money laundering counts. He faces the usual stringent standard of review: if the evidence presented at trial, taken in the light most favorable to the prosecution, can support the jury's conclusion, his effort must fail. See United States v. Irorere, 228 F.3d 816, 822 (7th Cir. 2000). And, as even the facts we have already recounted suggest, this case was

not a close one for the prosecution.

To convict Seward of mail fraud under 18 U.S.C. sec. 1341, the government had to prove (1) that the defendant participated in a scheme to defraud; (2) that the defendant intended to defraud; and (3) that the defendant used the mails in furtherance of the scheme. United States v. Montani, 204 F.3d 761, 769 (7th Cir. 2000). Seward apparently concedes the sufficiency of the government's evidence on the first two elements, but he argues that the government did not meet its burden of proving the third element, use of the mails in furtherance of the scheme.

The mail fraud count rested entirely on Seward's mailing of his response to Taylor's motions for sanctions in theprobate court to Taylor's home in Texas. Seward argues that he mailed these documents to Taylor nearly seven months after his scheme ended, and accordingly, that the mailing could not have been made "for the purposes of executing the scheme," as the mail fraud statute requires. United States v. Castor, 558 F.2d 379, 384 (7th Cir. 1977). Seward is correct that the mail fraud statute does not reach every single use of the mails that is in any way remotely related to a scheme to defraud. See United States v. Maze, 414 U.S. 395, 399-402 (1974). The mailing must, at the least, be incidental to an essential part of the scheme or be a step in the plot. Schmuck v. United States, 489 U.S. 705, 710-11 (1989). In other words, the success of the scheme must in some measure depend on the mailing. Maze, 414 U.S. at 402. Seward's argument works only if the jury had to define the scheme in question as one that was limited to his initial withdrawals of money from O'Neal's accounts through the use of the forged signature forms and checks--an enterprise that we can assume ended in July 1994 when Taylor discovered it and began reversing the transactions. The indictment was not so limited, however: it charged O'Neal more broadly with a fraudulent scheme that lasted from June 20, 1994 until April 23, 1996. The specific allegations in the indictment covered both the efforts to withdraw mon ey from O'Neal's accounts and the effort to grab the entire estate by obtaining the probate court's acceptance of the forged will. When Seward mailed his

response to Taylor's motion for sanctions to Taylor in Texas and attached to it the forged will and various forged documents purporting to show the close business and personal relationship between O'Neal and himself, Seward was still trying to convince Taylor that the forged will was legitimate and that Taylor should drop the probate fight (and, not coincidentally, relinquish his status as executor of the estate). Had that effort been successful, Seward would have succeeded in defrauding O'Neal's estate out of every last cent. The jury could, and apparently did, believe the government's theory as to Seward's intentions when he mailed the response, and we find that the evidence of the mailing to Texas was sufficient to sustain Seward's conviction for mail fraud.

Seward also challenges the sufficiency of the evidence against him on the two money laundering counts. In order to convict him of money laundering, the government had to prove that Seward derived property from a specified unlawful activity and that he engaged in a monetary transaction involving that property. See 18 U.S.C. sec. 1957. The transaction or transactions that created the criminally-derived proceeds must be distinct from the money-laundering transaction, because the money laundering statutes criminalize "transaction[s] in proceeds, not the transaction[s] that create[ ] the proceeds." United States v. Mankarious, 151 F.3d 694, 705 (7th Cir. 1998). Seward argues that the government did not allege that he engaged in any money-laundering transactions that were distinct from the bank, mail, and wire fraud scheme that the government alleged in the first three counts of the indictment.

The government based the money-laundering counts on the following facts: On June 24, 1994, about four days after O'Neal's death, Seward went to CNB and used forged signature cards to open a joint account in his and O'Neal's names. Shortly after he opened the account, Seward called Harris Bank and, impersonating O'Neal, asked that Harris Bank liquidate a CD that O'Neal held there and transfer the proceeds to the new joint account at CNB. Harris Bank complied with the request and transferred

$84,447.27 into the CNB account. This was the first deposit into the CNB account. A few days later, Seward wrote two checks on the CNB account: one for $34,000 to pay down Seward's home equity line of credit, and one for $21,000 which Seward deposited in a friend's bank account. Each of these checks formed the basis for one of the money laundering counts.

These transactions demonstrate both unlawful activity and distinct transactions in the criminally derived proceeds. When Seward impersonated O'Neal and defrauded Harris Bank into transferring O'Neal's CD proceeds to the CNB account, Seward committed bank and wire fraud. That act of fraud was complete, and Seward had control over the proceeds of the fraud, once the money was placed in the CNB account. The checks Seward then wrote on the account were, therefore, transactions in the proceeds of the bank fraud. Seward argues that these transactions could not be used to support the money laundering conviction because the government included the two checks drawn on the CNB account in a list set forth in the indictment of transactions in furtherance of the mail, wire, and bank fraud schemes. According to Seward, the indictment language shows that under the government's own conception of the case, the two checks were a part of Seward's fraud scheme. Therefore, Seward reasons, those same transactions could not also be transactions in the proceeds of the schemes.

This argument misunderstands the applicable law. Although it is true that the defendant must have control of the proceeds of a fraudulent transaction before he can engage in money laundering with those proceeds, there is no requirement that the entire fraudulent scheme be complete before the defendant starts laundering the proceeds from early portions of the scheme. See United States v. Butler, 211 F.3d 826, 830 (4th Cir. 2000) (funds are "criminally derived if they are derived from a completed phase of an ongoing offense"); United States v. Morelli, 169 F.3d 798, 804 (3d Cir. 1999) (proceeds of a completed phase of an ongoing offense can be laundered "even if the money laundering transaction can also be considered a part of the continuing specified unlawful activity"). In fact,

this court has noted that money laundering can be a critical element in a complex fraud scheme because it helps keep the scheme afloat and helps disguise the source of the fraud proceeds. See United States v. Wilson, 98 F.3d 281, 282-83 (7th Cir. 1996). Thus, there is no reason that the government could not have viewed the checks drawn from the CNB account both as Seward's attempt to launder the proceeds of the early, already completed phases of his fraudulent scheme, and as part of his ongoing effort to defraud O'Neal's estate and to conceal his fraud. The evidence was also sufficient to sustain Seward's conviction for money laundering.

III

Having determined that Seward has presented no reason why his convictions should be reversed, we turn to his challenges to his sentence. Seward raises three challenges to the way in which the district court applied the Sentencing Guidelines to his conduct. In addition, Seward challenges the amount of restitution the district court ordered him to pay. We find that some of these arguments have merit, and thus have concluded that we must vacate the sentence in its entirety and remand the case for new sentencing proceedings consistent with this opinion. In so doing, we note that, on remand, the district court will be writing on a clean slate with respect to sentencing and will be free to address all the issues pertinent to sentencing that the parties have briefed in this appeal as well as any other relevant considerations not inconsistent with this opinion. See United States v. Young, 66 F.3d 830, 836 & n.4 (7th Cir. 1995).

A.

Seward first argues that the district court erred in increasing his Guideline offense level by two levels for obstruction of justice. The Sentencing Guidelines permit a two-level enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the . . . offense." U.S.S.G. sec. 3C1.1. The obstruction enhancement is not warranted merely

because the defendant took the stand and the jury did not believe his testimony; the enhancement is warranted, however, if the court finds that the defendant committed perjury. A finding of perjury in turn is proper if, while under oath or affirmation, the defendant gave false testimony concerning a material matter with the willful intent to provide false testimony. United States v. Dunnigan, 507 U.S. 87, 94 (1993). If the obstruction enhancement is based on the defendant's perjury and the defendant objects to the enhancement at sentencing, as Seward did, the district court must make a finding of obstruction of justice that encompasses all of the factual predicates for a finding of perjury (false testimony, materiality, and willful intent); it is preferable, although not absolutely required, for the court to address each element of the alleged perjury in a separate and clear finding. Id. at 95; see also United States v. Webster, 125 F.3d 1024, 1037 (7th Cir. 1997).

The district court's findings at Seward's sentencing unfortunately fell below the standards set out in Dunnigan. Seward's sentencing hearing took place in two phases, separated by about three weeks. At the first hearing, the district court stated that Seward's trial testimony was "incredible" and "obviously peppered with untruths," but ultimately the court decided to "give [Seward] the benefit of the doubt" and not to impose an obstruction of justice enhancement. The judge explained that even though Seward's testimony "sounded incredible to the Court," she thought it possible that Seward "thought he was telling the truth," and that his testimony was "simply contrary to the Government's testimony." She therefore did not sentence Seward at that time, choosing instead to continue the hearing to give Seward a chance to file a "Defendant's Version" explaining his view of the evidence. A few weeks later, Seward filed his Defendant's Version, against the advice of counsel. The document vehemently reiterated Seward's position that he and O'Neal were business partners, that everything he did was pursuant to O'Neal's wishes, and that none of the documents he presented was forged. At the second sentencing hearing, after reading the Defendant's Version, the district court returned to the obstruction of

justice issue. This time, the court reiterated its earlier position that it "found much of what Mr. Seward testified to at trial to be incredible" and that Seward's testimony "appeared to be peppered with untruths." The court then held that, although it did not make a formal finding that Seward had lied at the first hearing, the fact that Seward continued to insist on his version of the story in the Defendant's Version "solidifie[d]" the court's belief that Seward was being untruthful. Therefore, the court stated that it was "now making a finding of fact that [Seward] has, in fact, and is, in fact, being untruthful." The court based the obstruction enhancement on this finding.

The district court's bare holding that Seward was "being untruthful" falls short of even a liberal application of Dunnigan. Although the district court's ruling certainly indicates that the court found one element of perjury, false testimony, and read generously, could also indicate a finding that Seward's false testimony was willful, the district court gave no indication that it considered the false testimony material to any of the matters before the court. Indeed, although the court found that Seward's testimony was "peppered with untruths," it did not identify any particular statements it believed were false. This makes it nearly impossible for us to assess whether the district court's errors were harmless in the end, because we cannot assess the materiality of any of the lies the court found Seward was telling.

This is not to say that Seward's sentence could not properly have been enhanced for obstruction of justice. To the contrary, the government presented ample evidence of particular statements that Seward made, both at trial and in the Defendant's Version, which the government contends amount to perjury. On remand, the district court should consider the government's contentions and make the explicit findings required by Dunnigan. If after making such findings, the district court is convinced that an obstruction enhancement is appropriate, the court will of course be free to include that enhancement in Seward's new sentence calculation.

B.

   Seward next challenges the district court's calculation of the actual and intended loss that resulted from his scheme. The Sentencing Guideline for fraud crimes, U.S.S.G. sec. 2F1.1, keys a defendant's offense level, and hence his sentence, to the amount of loss the defendant's scheme, if successful, would have caused to his victims. See U.S.S.G. sec. 2F1.1, Application Note 8. In addition, 18 U.S.C. sec. 3663A instructs the district court to assess restitution based on the amount of actual loss caused by the defendant's offense. See United States v. Brierton, 165 F.3d 1133, 1139 (7th Cir. 1999). Applying these provisions, the district court calculated the intended loss from Seward's scheme at $390,558.41, which included $79,050 in actual losses from the fraudulent bank transactions, $181,508.41 in intended losses from the additional fraudulent transactions that Taylor was able to reverse, and $130,000 in attorneys' and executor's fees that the probate court assessed against Seward after it determined that the 1989 will was fraudulent. The court also assessed $209,050 in restitution to compensate O'Neal's estate for the $79,050 in actual losses from the fraudulent transactions and for the $130,000 in attorneys' and executor's fees.

   Seward asserts that the district court should not have included the attorneys' and executor's fees in the loss calculations. Because, as he points out, these are consequential or incidental damages, we agree with him that they are not properly included in the total. In calculating both the intended loss amount for the Sentencing Guidelines and the actual loss amount for restitution, the district court should include in the calculation all direct damages, but not include consequential or incidental damages. See United States v. Green, 114 F.3d 613, 618 (7th Cir. 1997) (loss calculation); United States v. Simmonds, 235 F.3d 826, 833 (3d Cir. 2000) (restitution); United States v. Mikolajczyk, 137 F.3d 237, 245 (5th Cir. 1998) (same); see also United States v. Arvanitis, 902 F.2d 489, 497 (7th Cir. 1990) (considering restitution prior to the enactment of 18 U.S.C. sec. 3663A). Attorneys' fees incurred in fighting a

fraudulent scheme are properly classified as consequential, not direct, damages, as we held in Arvanitis, 902 F.2d at 497. For this reason, it was clear error for the district court to include the attorneys' and executor's fees in its calculation of the intended loss and the restitution amount. On remand, the court should recalculate the intended loss and restitution amounts without reference to these fees.

Before leaving this subject, however, we note that we are somewhat puzzled as to why Seward raised this issue in his appeal, because it appears that the district court actually calculated the intended loss from his scheme at an amount lower than the loss that Seward's scheme, if successful, would have caused. According to the government's version of this case, Seward's scheme had two distinct phases: the fraudulent bank transfers and the attempt to force the 1989 will through probate. We have no quarrel with the district court's calculation of the intended loss from the first phase of the scheme. We do not understand, however, why the second phase did not place at risk the entire estate, given that success would have left Seward as the sole inheritor. On remand, the government is free to argue that the appropriate amount of intended loss from that portion of the scheme was the full value of the estate; Seward may respond, if any response is possible. The record does not reveal the full value of O'Neal's estate, and it is of course possible that that amount will turn out to be lower than the district court's initial calculation. The restitution amount should be set at the $79,050 of actual loss that Seward caused through the fraudulent bank transactions.

C.

Seward's final argument is that the district court erred in applying the "vulnerable victim" enhancement found in U.S.S.G. sec. 3A1.1(b) to his sentence. Seward did not object to the vulnerable victim enhancement at his sentencing hearings, and the government argues that we should therefore consider the argument waived. The government is correct that in some cases we have found that a defendant who states at sentencing that he has no objections to a presentence report has

waived any objections and cannot raise them for the first time on appeal. See, e.g., United States v. Staples, 202 F.3d 992, 995 (7th Cir. 2000). In other cases, depending on the exact words used and the circumstances, we have held that a failure to object to a presentence report results merely in a forfeiture of the objections, and that we can review the objections on appeal under a plain error standard of review. See, e.g., United States v. Perry, 223 F.3d 431, 433 (7th Cir. 2000). The record here might look more like the waiver cases than the forfeiture cases, but as we are remanding for full resentencing in any event and this issue will arise again, we say a word about it here.

The "vulnerable victim" enhancement provided by the Guidelines reflects the fact that some potential crime victims have a lower than average ability to protect themselves from crime. Those who prey on them incur reduced risks and costs in committing their crimes, which necessitates a higher than average punishment to deter the criminal behavior. See United States v. Grimes, 173 F.3d 634, 637 (7th Cir. 1999). In this case, the presentence report identified two categories of vulnerable victims. First, the report found that O'Neal himself was a victim of the fraud, because Seward's fraud interfered with O'Neal's wishes for the disposition of his estate. Because O'Neal was dead at the time of the fraud, he was obviously unable to do anything to discover or thwart the fraud. Second, the report noted that O'Neal's sisters, his heirs, were vulnerable because of their advanced ages, the long distance between their residences and Seward's arena of operations, and because they were initially unaware that O'Neal had left a will naming them as his beneficiaries. The district court accepted the recommendation in the presentence report and found that both O'Neal and the sisters could be considered vulnerable victims of Seward's fraud.

We cannot accept the idea that the Guidelines go so far as to recognize the deceased for purposes of the vulnerable victim enhancement. It is the estate in the first instance, and ultimately the living heirs, whose interests took over at the moment of O'Neal's death. Although

the sisters did not have an immediate interest in O'Neal's assets until after the probate court concluded its proceedings and the assets were ready for distribution, they were the ones who would have been injured in the end if Seward's scheme had succeeded. In that sense, we believe they can be considered as victims of Seward's fraud, even if the estate was the technical victim during probate. See United States v. McCall, 174 F.3d 47, 52 (2d Cir. 1998) (noting need to evaluate particular characteristics of estate to assess vulnerability).

The difficult question here is whether we ought to be looking at the sisters, who we are satisfied were vulnerable, or at Taylor, who appears to have been a competent manager of the estate. If Taylor's role as executor had been secure regardless of Seward's machinations, then we would be inclined to say that the sisters were too far removed from Seward's actions to qualify as the immediate victims. So, for example, if the sisters had been shareholders of a closely held corporation and Taylor its manager, the sisters would not be the victims of a person trying to defraud the company. But two reasons here persuade us that the sisters were indeed Seward's intended victims for this purpose. First, Taylor was not even on the scene between June 20 and June 28, the date when he arrived in Chicago. Seward had been moving quickly and effectively, and even though Taylor was able to undo many of his transfers, $79,050 of loss remained from that period. Second, as we have stressed in other contexts for this case, Seward's fraud included his effort to throw out the 1983 will, and along with it, Taylor's appointment as executor of the estate pursuant to that will. Had he succeeded in that effort, there would have been little thereafter that the three sisters could have done to stop him from looting the entire estate.

For these reasons, we do not find any clear error in the district court's decision that the sisters, elderly and distant as they were, were particularly unlikely to detect or thwart Seward's crime, and therefore vulnerable for purposes of the enhancement. See United States v. Gill, 99 F.3d 484, 486 (1st Cir. 1996); United States v. Stewart, 33 F.3d 764, 771 (7th Cir. 1994) (elderly

may be vulnerable victims of fraud when faced with issues of grief and mortality). Thus, on remand, the district court may apply the vulnerable victim enhancement once again.

   For the foregoing reasons, we Affirm Seward's conviction, Vacate Seward's sentence, and Remand the case to the district court for resentencing consistent with this opinion.