In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-4203, 99-4205, and 99-4210

United States of America,

Plaintiff-Appellee,

v.

Peter N. Fernandez, III, Peter N. Fernandez,
Jr., and Kenneth K. Getty,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 835--Ruben Castillo, Judge.

Argued February 21, 2001--Decided March 7, 2002


  Before Posner, Kanne, and Diane P. Wood,
Circuit Judges.

  Kanne, Circuit Judge.  On October 27,
1998, defendants  Peter N. Fernandez,
Jr., Peter N. Fernandez, III, and Kenneth
K. Getty, were convicted of eight counts
of mail fraud in violation of 18 U.S.C.
sec.sec. 1341 and 1346, four counts of
theft of funds in violation of 18 U.S.C.
sec. 666, five counts of engaging in
monetary transaction in property derived
from unlawful activities in violation of
18 U.S.C. sec. 1957, and four counts of
money laundering in violation of 18
U.S.C. sec. 1956. The indictment provided
that between the summer of 1996 and April
1997, defendants engaged in a scheme
designed to defraud the Village of Lyons
by rigging bids submitted for municipal
building projects and then laundering the
proceeds. On appeal, defendants argue
that their convictions should be vacated
because: (1) their activities fell beyond
the purview of 18 U.S.C. sec. 1341, (2)
neither the mail fraud counts nor the
jury instructions embraced "materiality"
as an essential element of the offense,
(3) independent of the mail fraud counts,
the money laundering counts cannot
survive, (4) the jury instructions
regarding the elements of money
laundering were inconsistent and
contradictory, and (5) the government

failed to establish a necessary element of the alleged 18 U.S.C. sec. 666 violations. We find each of these arguments to be unpersuasive and affirm the defendants' convictions.

I. History

Defendants were charged with eight counts of mail fraud, four counts of theft of funds, five counts of engaging in monetary transaction in property derived from unlawful activities, and four counts of money laundering. In essence, the indictment alleged that defendants engaged in a scheme designed to defraud the Village of Lyons by rigging bids submitted for municipal building projects and then laundering the proceeds. Each defendant entered a plea of not guilty. A jury convicted each defendant on all counts and the district court sentenced Getty to 66 months imprisonment, Fernandez, Jr. to 60 months imprisonment, and Fernandez, III to 48 months imprisonment.

The Village of Lyons is a municipal corporation and a political subdivision of the State of Illinois. Getty served as one of six elected trustees on the Lyons' Board of Trustees from 1991 until March 1996. As a trustee, Getty received a modest salary of $3,400 per year. In addition to being a trustee, Getty also owned his own insurance business, Kenneth K. Getty Insurance Company. On March 19, 1996, the presiding mayor of Lyons resigned for personal reasons. The Board then selected Getty to serve as acting mayor until April 1997.

Shortly after becoming acting mayor, Getty took certain steps to centralize his power. For example, Getty caused the village manager, who oversaw the day-to-day operations of Lyons, to be terminated without cause. Within weeks of the village manager's termination, the position was eliminated, and Getty assumed the village manager's full-time duties. Additionally, Getty sought to complete certain municipal building projects in Lyons in order to increase his chance of success in the next mayoral election. The projects included the renovation of the Village Hall and the construction of a new Village Public Works garage.

Getty consulted with his friend, Peter Fernandez, Jr., regarding the two building projects. Fernandez, Jr. was the sole owner of Norman-Marc Associates Design Build Firm ("Norman-Marc"). Soon thereafter, Getty chose, and the Board approved, Norman-Marc to serve as the first ever "Village Architect." Andrew M. Fernandez, Fernandez, Jr.'s younger brother and a licensed architect, occasionally provided architectural services to Norman-Marc. However, Norman-Marc was not a licensed architectural firm, and Fernandez, Jr. was not a licensed architect. Although the Board approved Norman-Marc's designation as "Village Architect," only Getty and Fernandez, Jr. negotiated the details of Norman-Marc's compensation. Getty agreed to pay Norman-Marc $100 per hour for consulting work, in addition to commissions on construction projects equivalent to 9% of the total cost of each project.

In June 1996, the Board authorized Lyons to solicit bids for both the renovation of the Village Hall and the construction of a new Public Works garage. Combined, these projects were estimated to cost approximately $1 million. As the cost of these projects would exceed $10,000, Illinois law required Lyons to conduct a formal bidding process, awarding the construction contracts to the lowest qualified bidder. Lyons employed a pre-qualification process whereby potential bidders would submit pre-qualification questionnaires, requiring background and financial information. Lyons would review the submitted questionnaires prior to accepting bids on the projects in order to determine whether the bidder was sufficiently qualified for the projects.

After the Board approved the construction plans, Getty directed that a one-day notice soliciting pre-qualification applications be placed in the Des Plaines Valley News, a weekly newspaper with a circulation of 5,000, as opposed to the Suburban Life Citizen, which had a circulation of 30,000 and usually served as the forum for Village bid solicitations. The notice directed interested bidders to obtain the pre-qualification questionnaires from Lyons' Building Department Commissioner, Michael Kerrigan. Kerrigan testified at trial, however, that he never received any

requests for pre-qualification questionnaires.

Evidence presented at trial revealed that Getty, Fernandez, Jr., and Fernandez, III caused pre-qualification questionnaires to be submitted by four companies-- Randolph I. Anderson Development Company, Inc. ("Randolph"), Thompson Enterprises, Riverside Construction Corporation ("Riverside"), and Midwest Industrial Construction, Inc. ("Midwest").

Before trial, the parties stipulated that Randolph I. Anderson was a full-time practicing attorney and that Randolph, the construction company, did not exist. Anderson was a friend of the Fernandez family and personally agreed to submit a pre-qualification questionnaire. However, Anderson decided not to submit a bid on the projects.

Thompson Enterprises also was not a valid company. Jeffery Thompson was Fernandez, III's former classmate and friend. Thompson testified at trial that during the summer of 1996, Fernandez, III encouraged him to submit a bid for the projects. At the time, Thompson was employed as a computer systems analyst for the Square D Company. Thompson testified that in mid-August, he met with Fernandez, Jr. and Fernandez, III. At this meeting, the Fernandezes gave Thompson a completed pre-qualification questionnaire bearing the name "Thompson Enterprises." Although the questionnaire listed Thompson's home telephone number and address, Thompson testified that he was not affiliated with such a company. Thompson also testified that most of the information on the questionnaire was false, including purported clients and information regarding previous projects. Additionally, the questionnaire was pre-dated for July. Thompson also testified that during this meeting, Fernandez, Jr. calculated the dollar amounts that Thompson was to submit as bids for the projects. Fernandez, III and Thompson typed this information onto bid forms, and then Thompson signed his name. Fernandez, Jr. instructed Thompson not to talk to anyone from the Board who might try to contact him. Additionally, Fernandez, Jr. told Thompson to change his outgoing home answering machine message to indicate that the caller had

reached Thompson Enterprises.

Riverside owner and long-time friend of Getty, Jack Andersen, testified that Getty personally requested that Riverside bid on the projects. Further, Andersen testified that Getty requested that Riverside "bid high." Andersen explained that Riverside was a union shop with prices generally too high for municipalities, and that Riverside primarily did concrete work. Andersen also stated that Getty filled out the pre-qualification questionnaire and the bid forms on behalf of Riverside. Andersen explained that on August 13, 1996, Getty visited Andersen's office and asked Andersen general questions about Riverside. During the visit, Getty presented Andersen with a blank pre-qualification questionnaire and bid forms, and asked Andersen to signed them. Anderson complied. Andersen testified that the following day he received from Getty, via facsimile, a completed pre-qualification questionnaire dated July 29, 1996, and completed bid forms for the two projects. He testified that all of the forms were going to be submitted on behalf of Riverside. Although the forms were purportedly completed by Riverside, Andersen testified that he did not complete any of them.

Finally, Fernandez, III submitted a pre-qualification questionnaire and bids on behalf of Midwest. Fernandez, III listed three clients as references for Midwest. All three clients subsequently testified that Midwest had never done any work for them. Since 1994, Fernandez, III had worked as construction superintendent for a company named Industrial Construction, Inc. ("Industrial"). It was Fernandez, III's duty at Industrial to bid on projects. James Zakovec, the owner of Industrial, testified that he thought that Fernandez, III was bidding on the Lyons projects on behalf of Industrial, not on behalf of Midwest. Zakovec testified that eventually he and Fernandez, III agreed that Industrial would work as Midwest's subcontractor on the two projects.

Lyons awarded the contracts to Midwest because Midwest's bids were the lowest bids the Board received. Lyons agreed to pay Midwest $963,200 to complete the two projects. Midwest subcontracted with

Industrial for $784,200. Thus, Midwest stood to make $179,000 on the completed projects.

It was not until after Midwest submitted the lowest bid and the Board selected Midwest's bid that Fernandez, III filed Articles of Incorporation in the State of Illinois for Midwest and sought an Employer Identification Number for Midwest. Additionally, Midwest did not secure worker's compensation and employer liability insurance until after the bids were awarded. Through his contacts in the insurance industry, Getty helped Midwest secure the insurance policies.

One month after receiving the contracts, Midwest opened a bank account. Fernandez, III and Fernandez, Jr. were the signatories on the account. By April, 1997, Fernandez, Jr. and Fernandez, III had deposited checks and cash from Lyons totaling $722,960. Evidence was presented at trial which revealed that Midwest wrote seven checks to "Cash" from the account, totaling $32,200. Additionally, $51,400 in checks were written to Fernandez family members and $17,521.79 in checks were used to pay personal, non-business expenses.

Additionally, throughout the aforementioned events, Norman-Marc was providing its purported architectural services to Lyons. Through December 1997, Norman-Marc deposited checks from Lyons totaling approximately $148,000. Of that amount, $136,097.50 was related to work Norman-Marc had done on the two projects that had been awarded to Midwest. Between June 1996 and June 1997, checks totaling $126,450 were written from Norman-Marc's account to "Cash" and to various Fernandez family members.

During the course of construction, Fernandez, Jr. requested and Getty approved multiple change orders on the projects. The change orders added $320,219 to the amount Lyons owed Midwest. By the time a new building commissioner issued a "stop-work" order in April 1997, Midwest's net profit on the projects was $93,271.

On September 8, 1998, Getty, Fernandez, Jr., and Fernandez, III were charged in a twenty-one count Superseding Indictment. Counts 1 through 8, the mail fraud

counts, detailed the bid-rigging scheme and provided that defendants devised to defraud Lyons of money and property by means of false and fraudulent pretenses, representations, and promises and material omissions; to deprive Lyons and its citizenry of their right to Getty's honest services as the mayor of Lyons; and to deprive Lyons and its citizenry of their right to Fernandez, Jr.'s honest services as Village Architect. Each count listed a different mailing used to further defendants' scheme to defraud Lyons and Lyons' citizenry./1 Counts 9 through 12 charged defendants with obtaining by fraud funds in excess of $5,000 on four separate occasions from Lyons, a local government, which receives in excess of $10,000 per year under federal programs. Counts 13 through 17 charged defendants with knowingly engaging in a monetary transaction in criminally derived property of a value greater than $10,000, which was derived from mail fraud. Each of these counts listed an individual check drawn from Midwest's bank account in an amount greater than $10,000. Finally, Counts 18 through 21 charged defendants with conducting a financial transaction involving the proceeds of the mail fraud, with the intent to promote the carrying on of the mail fraud, knowing that the property involved in the financial transaction represented theproceeds of some form of unlawful activity. Again, each of these counts listed a separate check drawn from Midwest's bank account used to make partial payments to Industrial for construction work performed on the two projects.

On October 27, 1998, the jury returned a verdict finding Getty, Fernandez, Jr., and Fernandez, III guilty on all counts.

II.  Analysis

A.  Mail Fraud

Defendants present three arguments in support of their assertion that their mail fraud convictions should be vacated. First, defendants claim that their activities fell beyond the purview of 18 U.S.C. sec.sec. 1341/2 and 1346/3 because the government failed to prove "a legally cognizable scheme to defraud." Second, defendants claim that their activities fell beyond the purview of 18

U.S.C. sec.sec. 1341 and 1346 because the mailings that the government used as the basis for defendants' mail fraud convictions were not mailings used "in furtherance of a scheme." Third, defendants claim that neither the indictment nor the jury instructions embraced the concept of "materiality" as an essential element of mail fraud and therefore, because the government failed to establish an essential element of the crime, the defendants argue that they were not proven guilty beyond a reasonable doubt.

1.  Scheme to Defraud

Defendants' first argument on appeal lacks merit and warrants minimal discussion. Defendants contend that the government needed to prove a "contemplated harm to the victim" in order to prove a "scheme to defraud." Normally, when a defendant challenges the sufficiency of the evidence presented, we review the evidence in a light most favorable to the government and if any evidence can support the conviction, the defendant's efforts must fail. See United States v. Seward, 272 F.3d 831, 835 (7th Cir. 2001). In this case, however, we do not have to review the sufficiency of the evidence because to establish their prima facie case, the government did not have to prove a contemplated harm to a victim as the defendants contend. This court has repeatedly stated that to convict for mail fraud under 18 U.S.C. sec. 1341, the government must prove three elements: (1) that the defendant participated in a scheme to defraud; (2) that the defendant intended to defraud; and (3) that the defendant used the mails in furtherance of the scheme. See id. This Circuit has never required the government to establish a "contemplated harm to the victim." Defendants' reliance on United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994) ("[D]eceit must be coupled with a contemplated harm to the victim.") (quotation omitted) and on United States v. Jain, 93 F.3d 436, 441 (8th Cir. 1996) (quoting D'Amato) is misplaced. Even if D'Amato were the law in this Circuit, defendants ignore the D'Amato court's explanation that fraudulent intent, which is essential to a scheme to defraud, may be inferred from the scheme "[w]hen the 'necessary result' of the actor's scheme is to injure others." 39 F.3d at 1257. In

this case, the necessary result of the defendant's actions was to deprive Lyons and its citizenry of the opportunity to award and receive construction work at the most competitive price and the honest services of Getty and Fernandez, Jr. Contrary to defendants' assertion, we fail to find anything in the language of United States v. Bloom, 149 F.3d 649 (7th Cir. 1998), to support their position that this Circuit requires the government to prove a contemplated harm to a victim. In Bloom, this court compared a violation of state-law fiduciary duties and federal mail fraud. See id. at 654-58 (explaining that in order to establish mail fraud under the intangible rights theory the government must show that an employee misused his position for private gain). Bloom says nothing about a contemplated harm to a victim, much less that such harm must be established in order to sustain defendants' convictions.

2. Mailings in Furtherance of the Scheme

Next, defendants argue that the government failed to prove that they used the mails in furtherance of a scheme to defraud. See Seward, 272 F.3d at 835. In challenging the sufficiency of the evidence against them, defendants "face[ ] the usual stringent standard of review: if the evidence presented at trial, taken in the light most favorable to the prosecution, can support the jury's conclusion, [defendants'] effort[s] must fail." Id.

Initially, defendants assert that any purported scheme ended on August 20, 1996, the date that Midwest was awarded the contracts by Lyons. Thus, they argue, because the mailings listed in counts 2 through 8 in the indictment all transpired after August 20, the mailings occurred after any purported scheme had ended. Further, defendants claim that even if the scheme did not end on August 20, the mailings listed in the indictment were ancillary to, and not in furtherance of, any purported scheme. We find defendants' arguments unpersuasive.

Defendants' scheme to defraud involved depriving Lyons and its citizenry of money and property and the honest services of Getty and Fernandez, Jr. Defendants' scheme did not end on August

20, as the defendants would have this court believe. Rather, defendants' scheme continued through April 1997--when the stop-work order was issued--because until the stop-work order was issued, Midwest continued to receive payments from Lyons and defendants continued to conceal the truth about their bid- rigging scheme.

Moreover, in Seward, this court explained that while "the mail fraud statute does not reach every single use of the mails that is in any way remotely related to a scheme to defraud," a mailing will be considered in furtherance of the scheme if it is "incidental to an essential part of the scheme. . . . In other words, the success of the scheme must in some measure depend on the mailing." Id. at 835-36 (citations omitted). We find that the mailings listed in Counts 2 through 8 are, in fact, essential parts of defendants' scheme. For example, Count 2 charges defendants with sending a letter to Thompson Enterprises informing Thompson that it was not a successful bidder and Count 4 charges defendants with sending a letter from Getty to Midwest informing Midwest that its bid had been selected. These notifications were not merely ancillary to the execution of the fraud, rather, each of these letters furthered defendants' scheme by falsely portraying to anyone who examined Lyons' records that the bids submitted were legitimate, thereby concealing the true nature of the scheme. Similarly, the mailings in Counts 3 through 8 all contributed to the success of defendants' scheme./4 Each mailing helped to further the scheme by falsely portraying the legitimacy of Midwest. Defendants needed Midwest to ap pear legitimate in order to collect payments from Lyons. Thus, the mailings charged in the indictment were in furtherance of the scheme to defraud.

3. Materiality

Finally, relying on Neder v. United States, 527 U.S. 1, 25, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999), defendants argue that "materiality" is an essential element of mail fraud and because the indictment and the jury instructions failed to allege materiality, the government failed to prove an essential element of the crime. Thus, defendants contend that their convictions should be

vacated. In Neder, the Supreme Court held that "materiality" is an essential element of "scheme to defraud" under the mail fraud statute. See id. This court has explained that "[a] false statement is material, [and thus may potentially establish violation of wire and mail fraud statutes], if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." United States v. Gee, 226 F.3d 885, 891 (7th Cir. 2000) (quotation omitted).

Because defendants did not challenge the indictment prior to trial, the indictment will be deemed sufficient "unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." United States v. Gooch, 120 F.3d 78, 80 (7th Cir. 1997) (quotation omitted). We do not find the indictment to be so defective. The indictment alleged (1) that the defendants, by submitting three illegitimate bids, rigged the bidding process, (2) that defendants prepared false responses to pre-qualification questionnaires, and (3) that the defendants' scheme included "false and fraudulent pretenses, representations, and promises and material omissions" intended to cause Lyons to lose money and property. These allegations encompassed the concept of materiality. The defendants' alleged actions clearly would have influenced Lyons' decision to award the contracts to Midwest. Defendants knew that a reasonable person, particularly a Trustee voting on who to award the contracts to, would attach importance to such matters as whether the bidding company existed, whether the company had experience, and whether costs were projected by the company in good faith rather than contrived estimates.

With respect to the jury instructions, because defendants did not raise this objection in the court below, we review only for plain error. See United States v. Olano, 507 U.S. 725, 732-34, 1135 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). We will reverse only if the error was (1) clear and uncontroverted at the time of appeal and (2) affected substantial rights, which means the error affected the outcome of the district court proceedings. See United States v. Holmes,

93 F.3d 289, 292-93 (7th Cir. 1996) (quotation omitted)./5 While we recognize that the district court did not explicitly instruct the jury on "materiality," we find that, when viewed in their entirety, the jury instructions encompassed the concept of materiality.

In this case, the judge charged the jury: "In considering whether the government has proven a scheme to defraud, it is essential that one or more of the false pretenses, representations, promises and acts charged in the portion of the indictment describing the scheme be proved." The judge then stated that "[a] scheme to defraud is a scheme that is intended to deceive or cheat another and to obtain money or property or cause the loss of money or property to another or to deprive another of someone's honest services." Finally, the judge explained that "'intent to defraud' means that the acts charged were done knowingly with the intent to deceive or cheat a victim in order to cause a gain of money or property to the defendant or to deprive another of someone's honest services." Again, materiality has been defined as having "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." Gee, 226 F.3d at 891 (quotation omitted). We believe that these instructions adequately required the jury to find that the defendants made false representations which were capable of influencing, and thereby deceiving, Lyons. Thus, these instructions viewed in their entirety adequately embraced the concept of materiality. See also United States v. Reynolds, 189 F.3d 521, 525 n.2 (7th Cir. 1999) (explaining that instructions adequately placed the question of materiality before the jury even though the instructions did not explicitly use the term "materiality"); United States v. Pribble, 127 F.3d 583, 589 (7th Cir. 1997) (same)./6


B.  Money Laundering Counts

Next, defendants challenge their money laundering convictions./7 Defendants assert that the money laundering convictions and sentences should be vacated because the district court gave inconsistent and contradictory money laundering jury instructions. We do not

agree with defendants' characterization of the jury instructions.

Because defendants did not object to the money laundering instructions at trial, we review defendants' challenge for plain error. See Olano, 507 U.S. at 732-34. Defendants were charged with violations of 18 U.S.C. sec.sec. 1957(a) and 1956(a)(1)(A)(i)./8 The district court instructed the jury that the government must prove "[1] that the defendant engaged or attempted to engage in a monetary transaction, [2] that the defendant knew the transaction involved criminally derived property, [3] that the property had a value greater than $10,000, [4] that the property was derived from mail fraud, and [5] that the transaction occurred in the United States." The district court then stated:

The government must prove that the defendant knew that the property represented the proceeds of some form of activity that constitutes a felony under state or federal law. The government is not required to prove that the defendant knew that the property involved in the transaction represented the proceeds of mail fraud.

Defendants argue that initially the district court instructed the jury that in order to sustain the money laundering counts, the criminally derived property had to be derived from mail fraud. Then, according to defendants, the district court told the jury that the government needed only to prove that the property represented the proceeds of some form of activity that constitutes a felony under state or federal law. Defendants now argue on appeal that these instructions were confusing and directly contradictory.

Defendants, however, fail to see the difference between the relevant instructions. As stated in the instructions, the government did not need to prove that the defendants knew the criminally derived property was derived from mail fraud, only that the defendants knew that the transaction involved some form of criminally derived property. Additionally, the government needed to prove that the criminally derived property was, in fact, derived from mail fraud. The instructions in question

presented these two different elements that the government needed to establish. Thus, the jury instructions were neither inconsistent nor contradictory.

## C. Theft of Funds

Finally, defendants argue that their convictions under 18 U.S.C. sec. 666 should be vacated./9 Defendants assert that the government failed to establish a necessary element of the offense, the requisite link between a federal interest and the defendants' fraud. We do not believe that it is necessary for the government to establish such a link. Section 666 punishes an agent of a local government who obtains through fraud property valued at $5,000, or more, from a local government that receives, in any one-year period, benefits in excess of $10,000 from federal funds. See 18 U.S.C. sec. 666. In United States v. Grossi, a township supervisor was convicted of taking brides in exchange for payments out of the town's general assistance program in violation of 18 U.S.C. sec. 666. 143 F.3d 348, 349-50 (7th Cir. 1998). On appeal, the defendant asserted that since the township's general assistance program was funded entirely by local sources, the requirement that the local government receive $10,000 in federal funds was not satisfied. See id. at 350. In reply to the defendant's argument, this court explained that "money is fungible and its effect transcends program boundaries." Id. Because the parties stipulated at trial that Lyons received over $10,000 under a federal program in 1996 and 1997, it was not necessary for the government to further establish a link between the defendants' fraud and a federal interest. See id.

## III. Conclusion

For the foregoing reasons, we AFFIRM the convictions of Getty, Fernandez, Jr., and Fernandez, III.

FOOTNOTES

/1 Count 1 charges defendants with a mailing sent to Midwest. Count 2 charges defendants with a mailing sent to Thompson Enterprises. Count 3 charges defendants with mailing Midwest's Article of Incorporation to the Secretary of the State of Illinois. Count 5 charges defendants with a

letter containing an Employer Identification Number for Midwest. Count 6 charges defendants with a mailing from an insurer to Midwest containing Midwest's worker's compensation and employer liability insurance policy. Finally, Counts 7 and 8, charge defendants with mailing checks from Industrial to one of its subcontractors, Mathis Plumbing, for work Mathis Plumbing performed on the Lyons projects.

/2 Title 18 of The United States Code Section 1341 is entitled "Frauds and Swindles." It provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . shall be fined under this title or imprisoned not more than five years, or both.

/3 Title 18 of the United States Code Section 1346 defines scheme to defraud, which includes "a scheme or artifice . . . designed to deprive another of the intangible right of honest services."

/4 Count 3 charges defendants with mailing Midwest's Articles of Incorporation to the Secretary of the State of Illinois. Count 5 charges defendants with a letter containing an Employer Identification Number for Midwest. Count 6 charges defendants with a mailing from an insurer to Midwest containing Midwest's worker's compensation and employer liability insurance policy. Finally, Counts 7 and 8 charge defendants with mailing checks from Industrial to one of its subcontractors, Mathis Plumbing, for work Mathis Plumbing performed on the Lyons projects.

/5 We are aware that the defendants argue that their objection to the jury instructions should be deemed timely because it was based upon an intervening Supreme Court decision. Although we do not find the defendants' argument persuasive, under a harmless error standard of review our decision would be the same.

/6 We reiterate what we stated in Reynolds, "[a]lthough there is no plain error here, in the future, given the Court's ruling in Neder, district courts should include materiality in the jury instructions for sec. 1344." 189 F.3d at 525 n.2.

/7 Defendants assert that independent of the mail fraud counts, the money laundering counts (13-21)

cannot survive. Because we are affirming defendants' convictions under the mail fraudstatute, it is not necessary to discuss this argument.

/8 18 U.S.C. sec. 1956(a)(1)(A)(i) punishes "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. sec. 1957(a) punishes "[w]hoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."

/9 Title 18 of the United States Code section 666 provides in part:

  (a) Whoever, if the circumstance described in subsection (b) of this section exists--(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof--(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that--(i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; shall be fined under this title, imprisoned not more than 10 years, or both.

  (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

  (c) This section does not apply to bona fide

salary, wages, fees, or other compensation paid,
or expenses paid or reimbursed, in the usual
course of business.