# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3681

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

PAUL A. HENNINGSEN,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 CR 10—**J.P. Stadtmueller**, *Judge.*

———————

ARGUED SEPTEMBER 13, 2004—DECIDED OCTOBER 15, 2004

———————

Before BAUER, RIPPLE, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendant-Appellant Paul A. Henningsen appeals his convictions on four counts of mail fraud under 18 U.S.C. § 1341. Henningsen argues that there was insufficient evidence to support the convictions and challenges the factual findings made by the district court judge during sentencing. We affirm the convictions, but vacate the sentence and remand the case to the district court for resentencing. The mandate of this court is stayed pending the Supreme Court's decision in *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004).

## I. Background

Henningsen is a former Milwaukee alderman who had represented the city's Fourth Aldermanic District since 1983. He coordinated his re-election campaign fundraising activities through his "Henningsen for Alderman Committee." Typically, solicitations for re-election efforts involved providing prospective donors with pre-printed donation envelopes that bore campaign language such as, "Yes! I want to help re-elect Paul Henningsen for prosperous neighborhoods and vital downtowns." Donors would mail their contributions to Henningsen's re-election committee in the envelopes provided, whereupon the checks were supposed to be deposited in the campaign's bank account. Henningsen was the committee's treasurer and the sole signatory on the account. Consequently, he signed every check disbursing funds from the account.

In February 2002, Henningsen solicited a local developer, Jeff Chitko, for a donation, providing Chitko with a campaign contribution envelope. On February 12, 2002, Chitko mailed a donation of $375.00 to Henningsen's re-election campaign in the pre-printed envelope. Henningsen deposited the check in the campaign account, but first took back $100.00 in cash.

A similar pattern of soliciting and diverting funds continued. Again in February, Henningsen solicited another local developer, Robert Monnat, for a campaign donation, providing Monnat with a pre-printed envelope. On or about February 18, 2002, Monnat mailed a contribution of $200.00 to Henningsen's re-election committee. One month later, Henningsen solicited Karl Rajani for a campaign donation, providing him with an envelope. On or about March 13, 2002, Rajani mailed a donation of $375.00 to Henningsen's re-election committee. Upon receipt of the check, Henningsen deposited it in the campaign account, but first took back $200.00 in cash. Also in 2002, Henningsen asked a local

architect, Samuel Eppstein, for his assistance in raising a "war chest" of campaign funds to intimidate opponents. Eppstein agreed to help, and in April 2002 sent Henningsen the campaign contribution checks he had solicited on Henningsen's behalf.

These incidents of soliciting and then diverting campaign contributions were not isolated. From January 1, 2001, through July 22, 2002, the period at issue in the indictment, Henningsen withdrew $31,395 from the campaign account for his personal use, employing various methods. First, Henningsen wrote checks to cash from the campaign account. During this period, Henningsen wrote more than 150 of these checks, which in the aggregate totaled more than $23,000. Of these checks, Henningsen disclosed only five in his state-mandated campaign finance reports. While many of these checks were negotiated at the bank, others were cashed at local bars, restaurants, and a liquor store. Second, Henningsen diverted funds by taking cash back when depositing donations. Between February and July 2002, Henningsen obtained $1,000 this way, none of which were disclosed in campaign finance reports. Third, Henningsen wrote checks on the campaign account to cover personal expenses, such as money for his wife ($6,500), payments to cover a friend's rent ($2,370), purchase of a door for his home ($880), and repayment of a personal loan from a college-age campaign aid ($100).

During this time, Henningsen failed to accurately disclose the amounts that he was taking from the campaign account and, frequently, failed to report contributions received. From July through December 2001, Henningsen did not disclose any of the 24 donation checks that his campaign received, in amounts totaling $6,901. During that same six-month period, Henningsen wrote more than 20 checks to cash in a total amount in excess of $4,700.

On January 14, 2003, Henningsen was indicted on one count of extortion under 18 U.S.C. § 1951(a) and four counts

of mail fraud under 18 U.S.C. § 1341. On June 20, 2003, the jury found Henningsen guilty on the four mail fraud counts, but he was acquitted on the extortion count. Henningsen then filed a motion for a judgment of acquittal pursuant to FED. R. CRIM. P. 29, contending that the evidence was insufficient to support the jury's finding. The district court denied the motion. A sentencing hearing was convened on September 26, 2003, at which Henningsen challenged factual findings made by the district court judge that had enhanced Henningsen's base offense level under the federal sentencing guidelines. Specifically, Henningsen challenged the factual basis for the enhancements in connection with the amount of loss, the number of victims, and obstruction of justice. The judge denied Henningsen's objections and imposed a 33-month sentence for each of the four counts of mail fraud, to run concurrently. Henningsen was also ordered to pay a fine of $2,500 and restitution in the amount of $7,370.

## II.  Analysis

### A.  Sufficiency of the Evidence

Henningsen appeals the denial of his motion for a judgment of acquittal, contending that the evidence at trial was insufficient to support the jury's findings of guilt. On appeal, we consider the evidence in the light most favorable to the government and ask whether any rational jury could have found Henningsen guilty of mail fraud beyond a reasonable doubt. *United States v. Morris*, 80 F.3d 1151, 1160 (7th Cir. 1996).

The mail fraud statute prohibits devising a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," and executing that scheme by use of the mails. 18 U.S.C. § 1341. A conviction must satisfy three elements: (1) the defendant's participation in a scheme to defraud; (2)

the defendant's intent to defraud; and (3) the defendant's use of the mails in furtherance of the fraudulent scheme. *United States v. Hickok*, 77 F.3d 992, 1002-03 (7th Cir. 1996). Furthermore, the evidence must establish that the false representations were material. *Neder v. United States*, 527 U.S. 1, 25 (1999). A false statement is material if it has "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002). Henningsen challenges the sufficiency of the evidence with regard to the first two elements of the statute. We take each in turn.

### 1. *Scheme to Defraud*

Henningsen contends that the evidence at trial was insufficient to prove his participation in a scheme to defraud because his representations to contributors were not false. Specifically, Henningsen claims that all he promised donors was that he would run for re-election. Henningsen concludes that since he made good on this promise, no false representations were made, without which there can be no scheme to defraud.

This Circuit has found that a scheme to defraud exists when the conduct at issue has "demonstrated a departure from fundamental honesty, moral uprightness and candid dealings in the general life of the community." *United States v. Hammen*, 977 F.2d 379, 383 (7th Cir. 1992). The conduct must have also been material, in that it must have had "a natural tendency to influence . . . the decision of the decisionmaking body to which it was addressed." *Fernandez*, 282 F.3d at 508.

We believe that the jury's finding of a scheme to defraud was rational and supported by the evidence. There was ample evidence that Henningsen represented one thing to donors, but did another. The government showed that

Henningsen solicited donations using pre-printed campaign envelopes. Language on the envelopes included a pitch to support Henningsen's re-election bid and a blank for the amount contributed. The government presented evidence that Henningsen diverted $31,395 in campaign donations for private use through various methods, including writing checks to cash from the campaign account, taking back cash upon deposit of donations, and writing checks to pay for personal expenses. In addition, the evidence indicated that Henningsen failed to fully disclose campaign revenue and expenditures in campaign finance reports mandated by the State of Wisconsin. A rational jury could have easily determined on these facts that Henningsen's solicitation of campaign funds for private use was dishonest, and that it influenced donors' decisions to contribute.

Henningsen also makes a second argument: Since he had not met all of the donors who contributed to his campaign, he could not have made false representations to each of them. Here, however, Henningsen misunderstands the law. The crime of mail fraud does not include an element requiring a contemplated harm to a specific, identifiable victim. *Fernandez*, 282 F.3d at 506-07. Therefore, it makes no difference that Henningsen may not have solicited each donor individually. Each person who gave to Henningsen's re-election campaign and whose money was diverted for non-campaign expenses was a victim of his false representations.

### 2. Intent to Defraud

Henningsen also argues that a rational jury could not have found beyond a reasonable doubt that he acted with the specific intent of defrauding donors. While Henningsen admits to having diverted campaign funds for personal use, he claims that he was only compensating himself for prior loans that he had made to his campaign. Henningsen testified that he had loaned his campaign as much as $71,000.00

since 1983. Consequently, Henningsen argues, he could not steal that which he was entitled to recoup.

The jury, having heard Henningsen's testimony at trial, rejected this explanation. Such is its right; the jury is entitled to assess the credibility of Henningsen's testimony and to draw inferences from the rest of the evidence to conclude that Henningsen intended to defraud contributors. *Hickok*, 77 F.3d at 1003. Again, we believe that the jury's determination was supported by the evidence and was not irrational.

The government presented abundant evidence that Henningsen concealed his personal use of campaign funds. First, the government showed that Henningsen failed to disclose expenses, the result being that the account balances he reported to the public were wildly inaccurate. For example, Henningsen reported that as of December 31, 2000, he had a campaign account balance of $7,813.20, when in fact the actual balance was $652.21. At the end of June 2001, Henningsen reported a campaign account balance of $13,125.77, when the actual balance was $1,177.94. And at the end of June 2002, Henningsen reported a campaign account balance of $23,218.20, when the actual balance was $112.37. The government also demonstrated that Henningsen failed to document donations. For example, Henningsen did not disclose that he received 24 campaign checks totaling $6,901 between July and December 2001, while during that same period he wrote over 20 checks to cash, drawing over $4,700 from the campaign account. Additionally, the government established that Henningsen made false notations on the memo lines of campaign checks to cash, indicating names of persons who were to receive this cash. None received any of this money.

The government also demonstrated that Henningsen failed to document most of his personal loans to the campaign. By contrast, Henningsen carefully documented loans from others, including loans as minor as a $2.44 copying

charge. Finally, the government presented evidence demonstrating Henningsen's need for money, which included debts to the IRS totaling over $20,000, credit card debt, and his daughter's college expenses.

This court has found that to act with intent to defraud means to act "willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Moede*, 48 F.3d 238, 241 (7th Cir. 1995). Proof of intent to defraud is often proven through circumstantial evidence or by inferences drawn from the scheme itself. *Id.* The evidence at trial was certainly adequate to permit the jury to find an intent to defraud beyond a reasonable doubt.

## B. Sentencing

Henningsen also argues on appeal that the district court misapplied the federal sentencing guidelines. Specifically, Henningsen challenges the judge's factual findings that led to increases in the base offense level for his mail fraud convictions. Henningsen's challenge during sentencing and in his brief on appeal did not extend to the constitutionality of the enhancements. However, between submission of Henningsen's brief and Henningsen's argument before this court, the Supreme Court decided *Blakely v. Washington*, 124 S.Ct. 2531 (2004), which has called into question the constitutionality of sentencing enhancements based on facts not found by a jury. Following *Blakely*, this court held in *Booker*, 375 F.3d 508 (7th Cir. 2004), that such enhancements violate the Sixth Amendment.

Although Henningsen did not raise the issue of constitutionality in his brief, he made notice of the *Blakely* and *Booker* decisions in a subsequent filing and raised the issue during argument. In light of the uncertainty surrounding this issue and the questionable constitutionality of Henningsen's sentencing enhancement, we do not find that

Henningsen has waived his right to challenge the validity of the district court's sentencing enhancement.

The Supreme Court has granted certiorari in *Booker*, whereupon in the coming weeks it will determine the application of *Blakely* to the federal sentencing guidelines. Therefore, we will stay our mandate until *Booker* is decided. Within fourteen days of the Supreme Court's decision in *Booker*, both parties may submit a memorandum setting forth their views on the application of that decision to this case.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court on the merits, and VACATE the sentence and REMAND to the district court for resentencing. This court's mandate is stayed pending the Supreme Court's decision in *Booker*.

A true Copy:

  Teste:

        _____

        *Clerk of the United States Court of*
         *Appeals for the Seventh Circuit*