**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 6, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

KAY TEE,

     Defendant - Appellant.

No. 16-3243

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:15-CR-10078-JTM-1)**
_____

Kurt P. Kerns of Ariagno, Kerns, Mank & White, LLC, Wichita, Kansas (Melanie S. Morgan of Morgan Pilate LLC, Kansas City, Missouri, with him on the brief), for Defendant-Appellant.

Jason W. Hart, Assistant United States Attorney (Thomas E. Beall, United States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff-Appellee.

_____

Before **BACHARACH**, **McKAY**, and **MURPHY**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

Mr. Kay Tee appeals his conviction on three federal criminal counts:

(1) attempted coercion and enticement to travel to engage in prostitution,

(2) interstate transportation in aid of racketeering enterprises, and (3) money laundering. These counts grew out of Mr. Tee's discussions with a government informant (known as "Lucy") who had contacted Mr. Tee, ostensibly for help in opening a massage parlor in Wichita, Kansas. The government's trial theory was that Mr. Tee had tried to help Lucy, thinking that she wanted to buy a massage parlor and operate it as a prostitution business. Mr. Tee denied guilt and pressed an affirmative defense of entrapment. The jury rejected the entrapment defense and found guilt on the three counts, leading Mr. Tee to appeal.

This appeal involves four issues:

1.  *Sufficiency of the Evidence*: Mr. Tee contends that he was entrapped and that the evidence was insufficient to convict on any of the counts. We disagree. A reasonable jury could have found that Mr. Tee had tried to help Lucy buy a prostitution business and had a criminal intent and predisposition to commit the crimes. Consequently, the government presented sufficient evidence to prove the crimes and overcome the defense of entrapment.

2.  *Racial Discrimination During Voir Dire*: The expected trial evidence included numerous references to the Asian-American community in Wichita. For example, the government's trial theory was that massage parlors in Wichita's Asian-American community were largely fronts for prostitution. In addition, Mr. Tee and the government's two informants were of Asian descent. These facts led the prosecutor in voir dire to focus certain questioning on one venireperson who appeared to be Asian-American. With this venireperson and the others, the prosecutor asked about possible prejudice against Asian-Americans. Mr. Tee argues that this questioning involved racial discrimination. Because the issue was not preserved in district court, we review the challenge under the plain-error standard.

2

In our view, the district court did not commit plain error in allowing this questioning.

3. *Display of a Website (Rubmaps) as Demonstrative Evidence*: At trial, the government elicited testimony that Mr. Tee had told Lucy to look at reviews on *Rubmaps* to decide which massage parlor to buy. The government presented testimony that *Rubmaps*'s reviews involved ratings on sexual activity, not massages. To explain this testimony, the prosecution displayed screenshots from *Rubmaps* as a demonstrative exhibit. Mr. Tee argues that the demonstrative exhibit was unfairly prejudicial. We disagree, for the demonstrative exhibit helped the jury understand the sexual nature of the website.

4. *Introduction of Advertisements from Backpage*: The government presented advertisements prepared by Mr. Tee for a website, *Backpage*. Mr. Tee contends that the advertisements constituted hearsay and were unfairly prejudicial. We reject both contentions. Mr. Tee waived his hearsay objection, and the district court could reasonably conclude that the advertisements had not been unfairly prejudicial.

## I.    Mr. Tee was convicted based on his discussions with Lucy.

Mr. Tee was a Wichita businessman. Being Chinese and bilingual, Mr. Tee often worked as a middleman between Mandarin-speaking business owners and local vendors. Some of the businesses were massage parlors that were suspected fronts for prostitution.

To investigate these suspicions, the Wichita police arranged a series of telephone calls between Mr. Tee and Lucy. Lucy pretended to be a New York businesswoman interested in buying a massage parlor in Wichita. For over two months, Mr. Tee advised Lucy by telephone as she pretended to look for a massage parlor to buy.

3

The police also used another informant, a prostitute known as "Jenny," to investigate Mr. Tee. The police directed Jenny to seek Mr. Tee's help in selling her business. When Mr. Tee did not try to connect Lucy and Jenny, the police instructed Jenny to tell Mr. Tee that she had found a buyer. Jenny complied, telling Mr. Tee that the buyer was Lucy.

Mr. Tee tried to discourage Lucy from buying Jenny's business. He explained that Jenny had been busted once for prostitution and that another bust would lead the police to close the business. Instead, Mr. Tee encouraged Lucy to look for other available shops. But when Lucy continued to express interest in buying Jenny's massage parlor, Mr. Tee assured Lucy that he would help her finalize the purchase. In their last telephone call, Mr. Tee agreed to pick up Lucy at the airport.

Afterward Jenny paid Mr. Tee $100, but the parties disagree on the purpose of the payment. Mr. Tee told authorities that the fee was to pick up Lucy at the airport; the government characterizes the payment as a fee to broker the sale of Jenny's prostitution business to Lucy.

When Mr. Tee arrived at the airport to pick up Lucy, he was arrested. He was later convicted on the three counts.

## II. The evidence of guilt was sufficient to convict on each count.

Mr. Tee challenges the sufficiency of the evidence on each count and contends that the government failed to overcome his entrapment defense. In our view, a reasonable jury could find that Mr. Tee

4

- had been predisposed to commit the crimes and

- had intended to help Lucy buy and maintain a massage parlor, knowing that it would offer prostitution services.

## A.    Standard of Review

Sufficiency of the evidence entails a legal issue that we review de novo. *See United States v. Thomas*, 849 F.3d 906, 909 (10th Cir. 2017). In undertaking this review, we consider the evidence in the light most favorable to the government, asking whether any rational trier of fact could find every element of a given offense. *Id.* In answering this question, we cannot weigh conflicting testimony or consider the credibility of witnesses. *United States v. Rodebaugh*, 798 F.3d 1281, 1296 (10th Cir. 2015).

## B.    Entrapment

To find Mr. Tee guilty, the jury had to find each element of the crimes beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99, 104 (2013). Mr. Tee pleaded an entrapment defense; therefore, the government also had to disprove entrapment beyond a reasonable doubt. *United States v. Nguyen*, 413 F.3d 1170, 1178 (10th Cir. 2005).

Entrapment occurs when

- the government induces the defendant to commit the offense and

- the defendant is not predisposed to commit the offense.

*Id.*

5

Mr. Tee does not dispute inducement; instead, he contests the government's evidence on predisposition.[1] Predisposition may be shown by

> evidence of similar prior illegal acts or it may be inferred from defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity.

*Id.* (quoting *United States v. Duran*, 133 F.3d 1324, 1335 (10th Cir. 1998)) (quotation marks omitted).

## C. Persuasion of Interstate Travel To Engage in Prostitution

A crime is committed by knowingly attempting to persuade, induce, entice, or coerce a person to travel in interstate commerce to engage in prostitution. 18 U.S.C. § 2422(a). To prove this crime, the government needed to present sufficient evidence that Mr. Tee

- had knowingly attempted to persuade, induce, entice, or coerce Lucy to travel in interstate commerce, and

- had made this attempt with the intent for Lucy to engage in prostitution.

*See id.*; *United States v. Rashkovski*, 301 F.3d 1133, 1136 (9th Cir. 2002). And to overcome Mr. Tee's entrapment defense, the government needed to

---

[1] Mr. Tee's failure to address the element of inducement could arguably doom his entrapment defense. *See United States v. Ford*, 550 F.3d 975, 982 (10th Cir. 2008) ("both 'elements [are] required to find entrapment'" (quoting *United States v. Young*, 954 F.2d 614, 616 (10th Cir. 1992)) (alteration in original)). But we will assume, for the sake of argument, that the failure to address the element of inducement is not fatal to the defense.

prove beyond a reasonable doubt that Mr. Tee had been predisposed to commit the crime. *See* Part II(B), above.

Mr. Tee contends that the government failed to prove that

- he had tried to persuade Lucy to come to Wichita and

- he had been predisposed to commit the crime.

We reject Mr. Tee's contentions.

First, the government presented sufficient evidence that Mr. Tee had tried to persuade Lucy to travel from New York to Wichita. Mr. Tee argues that it was Lucy's idea to come to Wichita. Because the idea to travel originated with Lucy, he claims that a reasonable jury could not have found guilt. Mr. Tee is mistaken. Regardless of who originated the idea, Mr. Tee consistently encouraged Lucy to come to Wichita, boasting about how quickly and cheaply he could get her massage parlor ready:

- "I am very serious when it comes to doing work for other people, do you understand. . . . I don't mess around when it comes to doing work for other people." Appellant's App'x at 119.

- "There won't be any problems with the shop. I'll do everything and I'll take care of everything else. I have been taking care of things from beginning to end every time." *Id.* at 125.

- "Right now . . . the one you have will also be very quick. If you let us handle it, your expenses will not even be 16,000. I can get everything ready for you for 12,000." *Id.* at 144 (omission in original).

7

- "To be honest with you, for a new shop, all it needs is to post some ads and you'll get business right away. . . . If you want it, I can get it done for you in a week." *Id.* at 145.

- "Let me tell you. It's very easy to get business if you open a shop over here. All I have to do is to post an ad and it's easy to get business. And you'll get it very quickly . . . ." *Id.* at 153.

- "[W]e don't need a month or two because we do all the work ourselves, okay? We can get it ready for you in one week." *Id.* at 155.

- "The contacts would be another $500. I usually charge people 2,000." *Id.* at 160.

From these boasts, a reasonable jury could have found an intent to lure Lucy to Wichita to buy a prostitution business. But Mr. Tee did more than boast; he also expressly encouraged Lucy to come:

- "When are you coming down here to see [the massage parlor]?" *Id.* at 143.

- "If you get a chance, just come down here." *Id.* at 153.

- "The location that you are looking for, there are a lot of them available. Just come down to Wichita and we'll make arrangements for you to see them. And then you'll make a decision. There are lots of nice places." *Id.* at 154.

Mr. Tee knew that he could obtain a fee only if Lucy came to Wichita. So Mr. Tee repeatedly offered deals to Lucy, emphasizing how much he would help her, boasting about the Wichita massage-parlor market, and encouraging her to come to Wichita. Based on these statements to Lucy, a reasonable jury could have found an attempt to persuade Lucy to travel from New York to Wichita.

8

Second, a reasonable jury could have found that Mr. Tee had been predisposed to commit the crime. Mr. Tee makes three arguments for why he was not predisposed to commit the crime:

1.    There was no evidence that he had committed similar crimes in the past.

2.    The trial evidence proved only that he had conducted a lawful business for legitimate massage parlors.

3.    He demonstrated a lack of interest in helping Lucy buy a business.

These arguments fail.

The government did not need to provide evidence of similar crimes. Even without this evidence, predisposition can be inferred from a "'defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity.'" *United States v. Nguyen*, 413 F.3d 1170, 1178 (10th Cir. 2005) (quoting *United States v. Duran*, 133 F.3d 1324, 1335 (10th Cir. 1998)).

Though evidence of earlier criminality was unnecessary, it was present here. For example, the trial testimony reflected Mr. Tee's past associations with massage parlors known to engage in prostitution. And Mr. Tee's statements to Lucy showed his experience in brokering the sale of massage parlors. The evidence of past associations and Mr. Tee's

9

statements to Lucy allowed the jury to reasonably infer that Mr. Tee had brokered similar deals in the past.

In addition, the jury could reasonably infer that Mr. Tee had known that the massage parlors were fronts for prostitution. For example, Mr. Tee used slang that was commonplace in the prostitution business, such as "small acts," "big acts," "full body," and "half set." Appellant's App'x at 130, 147. The testimony explained that these slang terms referred to various sexual acts. And when Lucy revealed that her employees would give hand jobs, Mr. Tee remained interested in brokering a sale.

He further displayed an understanding of how massage parlors operate as prostitution fronts. For example, Mr. Tee told Lucy that "after [some people] have made money, . . . they don't want to do this type of business anymore . . . ." *Id.* at 122. The implication was that once some individuals made enough illegal money, they leave the prostitution business. And when Lucy asked where she could read reviews about the shops being recommended, he advised her to consult *Rubmaps*, which was an internet forum about the sexual services obtained at massage parlors.

Mr. Tee also appeared to understand the risks of buying a prostitution business that had already been busted. For example, Mr. Tee tried to stop Lucy from buying Jenny's shop because it had already been busted once. Mr. Tee explained to Lucy that a second bust would lead the police to close the business. This explanation reflected Mr. Tee's

10

familiarity with the risks of running a massage parlor as a prostitution front. *See United States v. Dyke*, 718 F.3d 1282, 1292 (10th Cir. 2013) (recognizing as evidence of predisposition that the defendant was "all too aware of the risk and reward calculus").

Notwithstanding these risks, Mr. Tee displayed a willingness to help Lucy buy a massage parlor to traffic in prostitution. Though Lucy initiated the contact, Mr. Tee was willing to assist. Lucy sometimes had to leave voicemails for Mr. Tee and ask him to move more quickly. But Mr. Tee also left voicemails for Lucy and encouraged her to act, telling her that

- buying a shop "will also be very quick" and
- "you'll get it very quickly."

Appellant's App'x at 144, 153.

Mr. Tee points to instances in which he discouraged Lucy from buying Jenny's shop. But Mr. Tee cautioned Lucy about Jenny's massage parlor only because he knew that it was under police surveillance and had been busted before. If the massage parlor were shut down, Mr. Tee might stop profiting from his relationship with Lucy. And even as Mr. Tee discouraged the purchase of Jenny's massage parlor, he encouraged Lucy to continue looking for another massage parlor to buy.

In our view, the evidence was sufficient to convict Mr. Tee of attempting to induce Lucy to travel across state lines to engage in prostitution. And the government presented sufficient evidence to

11

overcome Mr. Tee's entrapment defense. Therefore, we reject Mr. Tee's challenge to the sufficiency of the evidence on this count.

**D.      Use of a Telephone to Promote Prostitution**

Mr. Tee also contends that the government presented insufficient evidence to prove the use of a telephone to promote prostitution. 18 U.S.C. § 1952(a)(3). To establish the commission of this crime, the government needed to show that

- Mr. Tee had used a facility in interstate commerce,

- he had used the facility in interstate commerce with the intent to facilitate the promotion, management, establishment, or carrying out of an unlawful activity, and

- he had attempted to promote, manage, establish, or carry out an unlawful activity.

*See United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003). And to overcome the entrapment defense, the government needed to prove beyond a reasonable doubt that Mr. Tee had been predisposed to commit the crime. *See* Part II(B), above.

Mr. Tee does not contest

- the use of a telephone, which is a facility in interstate commerce, or

- the illegality of prostitution under Kansas law.

But he does contest the sufficiency of the evidence on three grounds:

1.    There was insufficient evidence to prove that he had used a telephone with the intent to facilitate the promotion, management, establishment, or carrying out of prostitution.

12

2. There was insufficient evidence to prove that he had attempted to perform an act promoting, managing, establishing, or carrying out prostitution.

3. There was insufficient evidence to prove predisposition.

These challenges are invalid.

First, a reasonable jury could find that Mr. Tee had intended to promote prostitution during the telephone calls with Lucy. In these calls, Mr. Tee showed awareness that Lucy had planned to offer sexual services at her massage parlor. Yet he continued to help her look for a massage parlor to buy. And Mr. Tee repeatedly assured Lucy that he would renovate, register, and advertise for her massage parlor, knowing that it would be a front for prostitution. This willingness to help Lucy buy a shop offering sexual services could lead a reasonable jury to find that Mr. Tee had intended to promote prostitution.

Second, the government presented sufficient evidence that Mr. Tee had acted on this intent when he attempted to pick up Lucy at the airport. Mr. Tee alleges that he attempted to pick up Lucy in order to dissuade her from buying a massage parlor linked to prostitution, but the jury could reasonably reject this explanation. After trying to discourage the purchase of Jenny's massage parlor, Mr. Tee continued to encourage Lucy to come to Wichita, explaining that there were other good massage parlors that she

13

could buy. A reasonable jury could find that Mr. Tee had intended to continue helping Lucy find a prostitution business to buy.

Finally, a reasonable jury could find that Mr. Tee had been predisposed to commit the crime. Mr. Tee responded to Lucy's initial call with an offer to help and demonstrated his experience with massage parlors operating as prostitution fronts. For example, Mr. Tee used slang terms to refer to sexual acts performed in massage parlors. And he understood the process used by police when investigating and closing down a massage parlor linked to prostitution. In addition, Mr. Tee displayed an eagerness to profit from the transaction, offering deals to Lucy so that she would continue working with him.

Because the jury could reasonably find each element of this crime, the evidence was sufficient to convict.

### E.    Money Laundering

Finally, Mr. Tee contends that the government presented insufficient evidence to convict on money laundering. *See* 18 U.S.C. § 1956(a)(1)(B)(i).

For this offense, the government needed to prove that

- Mr. Tee had conducted a financial transaction,

- the transaction had involved the proceeds of an unlawful activity,

- Mr. Tee had known that the proceeds derived from an unlawful activity, and

14

- Mr. Tee had conducted the financial transaction with knowledge that it was designed at least in part to conceal the nature of the proceeds of an unlawful activity.

*United States v. Caldwell*, 560 F.3d 1214, 1221 (10th Cir. 2009).

Mr. Tee argues that the government failed to prove that the transaction involved the proceeds of an unlawful activity. For this argument, Mr. Tee denies that Jenny continued to engage in prostitution and insists that Jenny's payment was only to pick up Lucy at the airport. This argument is invalid.

First, Mr. Tee denies the existence of evidence that Jenny continued to engage in prostitution after she was arrested. Without evidence of continued prostitution, according to Mr. Tee, the government failed to prove that Jenny's payment had involved the proceeds of prostitution. But the jury could reasonably view the evidence differently. For example, the jury could have regarded the $100 as a fee for brokering the sale of a prostitution business to Lucy. Because this transaction would have been for an unlawful act, the proceeds themselves would have derived from an unlawful activity. Thus, a reasonable jury could have found money laundering regardless of whether Jenny had continued to engage in prostitution.

Second, Mr. Tee argues that the $100 was paid just to pick up Lucy at the airport.[2] But contrary evidence existed. For example, an officer testified that Mr. Tee had admitted that the $100 was paid to connect Lucy and Jenny. With this testimony, the jury could reasonably reject Mr. Tee's explanation for the $100 payment.

Because the jury could reasonably reject Mr. Tee's arguments, we conclude that the evidence sufficed to convict on the count of money laundering.

The dissent disagrees, contending that § 1956(a)(1)(B)(i) was violated only if Mr. Tee conducted a transaction with the $100 after

---

[2]     As noted above, one element of this offense includes an intent to conceal the nature of the proceeds of an unlawful activity. Mr. Tee does not question satisfaction of this element; he instead defends his explanation for the $100 payment, insisting that it was to pick up Lucy at the airport rather than to broker the sale of a prostitution business.

We have little reason to question the sufficiency of the evidence on the element of concealment. Mr. Tee directed Jenny to wire transfer the $100 to an account for Alert America, a separate, legitimate computer-security company that Mr. Tee owned. Mr. Tee's invoices for Alert America described the company as "Security Camera & POS Systems Alarm Monitoring Service, Repair Computer & Networking, Business Sign." Appellant's App'x at 225-27. But Mr. Tee has never suggested that the $100 related to a business that monitored alarms, repaired computers, or dealt with business signage. Thus, the jury could reasonably infer that Mr. Tee had directed payment to his Alert America account to conceal the purpose of the payment. *See United States v. Shepard*, 396 F.3d 1116, 1121 (10th Cir. 2005) ("This circuit has noted that depositing illegal proceeds into the bank account of a legitimate business may support the inference of an intent to conceal.").

16

receiving it. But Mr. Tee did not make this argument either in district court or in our court.

On the money-laundering count, Mr. Tee states that he challenged the sufficiency of the evidence in district court, relying on pages 677 to 683 of the appendix. There he argued only that the government had not presented evidence of an attempt to conceal or disguise the proceeds because they had been "openly deposited in a business account." Appellant's App'x at 680. Mr. Tee did not say anything to suggest that guilt required a separate transaction after receiving the $100 from Jenny. Consequently, this potential argument was forfeited. *See United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007).

Though forfeited, this argument could be reviewable under the plain-error standard. *Id.* at 681 n.1 (en banc footnote); *see* p. 24, below. But Mr. Tee has not argued for plain-error review, so we would ordinarily decline to consider the potential argument even if it had been raised here. *See United States v. Lamirand*, 669 F.3d 1091, 1098 n.7 (10th Cir. 2012).

But Mr. Tee didn't just fail to present this argument in district court; he also failed to raise this argument in our court. After identifying the elements and summarizing the government's theory, Mr. Tee presented his argument in a single paragraph in his opening brief:

> By the time Lucy decided to "travel" to Wichita, she and Tee had been engaged in discussions for about two months. For this stranger who contacted him out of the blue, he had taken

and placed numerous phone calls, looked for locations for her to purchase, and had agreed to take time out of his work day to pick her up at the airport. The only evidence offered by the government to explain the $100 transaction is Tee's statement – that the money was to pay for a taxi ride to pick Lucy up at the airport. Notably Jenny didn't testify. And there is no evidence that Jenny's business continued to engage in prostitution activities or only engaged in prostitution activities such that Tee would know that the money came from prostitution. The "finder's fee" that Tee had discussed with Lucy was $500. And the government offered no evidence to suggest that amount had changed hands. The notion that the $100 was partial payment is purely speculative. Thus, the evidence is insufficient as to money laundering and Tee's conviction must be set aside.

Appellant's Opening Br. at 43-44. This paragraph bears no suggestion of an argument involving the absence of a transaction after Jenny's payment of the $100.

We ordinarily consider only the grounds presented by the appellant, wary of searching out our own reasons to reverse when the ground is not presented by the appellant:

> In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a *pro se* litigant's rights.

*Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008); *see also United States v. Burkholder*, 816 F.3d 607, 620 n.11 (10th Cir. 2016) ("In our adversary, common-law system, courts properly answer only the questions

that the parties present to them and that are necessary for the resolution of the case at hand.").

The dissent points out that in certain circumstances, a federal appellate court can decide an issue that was not decided in district court. Dissent at 5-6. For this proposition, the dissent relies on a passage in *Singleton v. Wulff*: "Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt or where 'injustice might otherwise result.'" 428 U.S. 106, 121 (1976) (quoting *Hormel v. Helvering*, 312 U.S. 552, 557 (1941)).

This passage does not support sua sponte consideration of the dissent's argument. In a few civil appeals, we have raised grounds sua sponte to reverse. *See Margheim v. Buljko*, 855 F.3d 1077, 1088-89 (10th Cir. 2017); *Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 836-38 (10th Cir. 2014). But we exercise that power "sparingly," reversing sua sponte only when the circumstances are exceptional and the parties are given an opportunity to address the issues raised by our court. *Margheim*, 855 F.3d at 1088-89; *Planned Parenthood of Kan. & Mid-Mo.*, 747 F.3d at 836-38.

Here the circumstances are not exceptional and the government has not had an opportunity to address the argument raised by the dissent. Indeed, in the single opinion relied on by the dissent (*Singleton*), the

19

Supreme Court *reversed* the Court of Appeals for deciding the issue in the first instance. After announcing the Court of Appeals' discretion to avoid an injustice by deciding an issue in the first instance, the Supreme Court added:

> Suffice it to say that this is not such a case. The issue resolved by the Court of Appeals has never been passed upon in any decision of this Court. This being so, injustice was more likely to be caused than avoided by deciding the issue without petitioner's having had an opportunity to be heard.

*Singleton*, 428 U.S. at 121.

The dissent sees little downside to addressing the issue, viewing its conclusion as undebatable. Dissent at 6. We are not so sure. For its view, the dissent relies solely on opinions interpreting 18 U.S.C. § 1957. *Id.* at 2-5 (citing *United States v. Seward*, 272 F.3d 831, 836-37 (7th Cir. 2001); *United States v. Butler*, 211 F.3d 826, 830 (4th Cir. 2000); *United States v. Johnson*, 971 F.2d 562, 569-70 (10th Cir. 1992)). But Mr. Tee was convicted under § 1956, not § 1957, and the two statutes bear different elements. *See United States v. Bush*, 626 F.3d 527, 536 (9th Cir. 2010) ("Sections 1956 and 1957 contain different elements . . . ."); *see also United States v. Hill*, 167 F.3d 1055, 1069-70 (6th Cir. 1999) (stating that §§ 1956(a)(1)(B) and 1957 "each requires proof of an element the other does not"). Section 1956 punishes individuals for conducting financial transactions with the proceeds of specified unlawful activities, knowing that the transactions are designed to conceal or disguise the nature,

20

location, source, ownership, or control of the proceeds. 18 U.S.C. § 1956(a)(1)(B)(i). In contrast, § 1957 addresses "monetary transactions in criminally derived property." 18 U.S.C. § 1957(a).

The term "criminally derived property" refers to funds obtained from a criminal offense. 18 U.S.C. § 1957(f)(2); *see Johnson*, 971 F.2d at 568 ("Under § 1957, 'criminally derived property' means any property constituting or derived from proceeds obtained from a criminal offense."). Thus, § 1957 is violated only if the transaction generating the criminally derived proceeds is distinct from the money-laundering transaction. *United States v. Seward*, 272 F.3d 831, 836 (7th Cir. 2001). Section 1956 is different:

> All that is required to violate § 1956 is a transaction meeting the statutory criteria that takes place after the underlying crime has been completed. Thus, the central inquiry in a money laundering charge is determining when the predicate crime became a "completed" offense . . . .

*United States v. Kennedy*, 64 F.3d 1465, 1477-78 (10th Cir. 1995).

This difference is illustrated by the sole Tenth Circuit opinion invoked by the dissent: *United States v. Johnson*, 971 F.2d 562 (10th Cir. 1992). There the underlying crime, wire fraud, consisted of inducement to send wire transfers to the defendant's account. *Johnson*, 971 F.2d at 567. The receipt of those wire transfers did not involve proceeds obtained from a criminal offense. *Id*. at 568. Section 1957 would have been violated only if the recipient of the wire transfers had later conducted some transaction

21

with the funds. *Id*. at 568-70. There were no subsequent transactions, so the defendant did not violate § 1957. *Id*. at 569-70.

We distinguished *Johnson* in *United States v. Kennedy*, 64 F.3d 1465 (10th Cir. 1995). There the defendant obtained funds from mail fraud and was convicted of money laundering under § 1956(a)(1)(A)(i). *Kennedy*, 64 F.3d at 1477. The defendant challenged the money-laundering conviction based on *Johnson*, arguing that guilt under § 1956(a)(1) required a transaction after completion of the underlying crime. *Id*. We rejected this challenge, concluding that the required transaction had taken place. *Id*. at 1477-78.

In *Johnson*, the underlying crime had been wire fraud, which was not completed until the funds were wired into the defendant's account. *Id*. at 1478. Thus, "the wirings could not also be used to support convictions for § 1957 money laundering crimes." *Id*. In contrast, the *Kennedy* defendant obtained funds from the previously completed crime of mail fraud. *Id*. "It was the subsequent and distinct transfers of funds that were alleged as the separate transactions involving 'proceeds of specified unlawful activity' which constituted the alleged money laundering under § 1956." *Id*. This difference proved critical in *Kennedy* because §§ 1956 and 1957 had been designed to criminalize "new conduct that occurs after the completion of certain criminal activity, rather than simply to create an additional punishment for that criminal activity." *Id*.

22

Under *Kennedy*, Jenny's wire transfer of $100 to Mr. Tee may have constituted a new financial transaction with the proceeds from a previously committed offense (the brokering of a sale of a prostitution business). We need not decide this question, however, because it was not raised either in district court or on appeal. Had this question been presented, it would have entailed a thorny issue of first impression in our circuit. Unlike the dissent, we decline to decide this issue sua sponte after Mr. Tee bypassed opportunities to raise the issue in district court and on appeal.

### III. The prosecutor's questioning in voir dire did not create an obvious constitutional violation.

Mr. Tee also challenges the prosecutor's questioning during voir dire. The prosecutor's evidence suggested that many local massage parlors owned by Asian-Americans were actually houses of prostitution. In addition, Mr. Tee, Lucy, and Jenny are of Asian descent. Ostensibly for these reasons, the prosecutor focused on the single venireperson who appeared to be Asian-American, questioning

- him about the impact of his ethnicity and

- others about whether this venireperson's involvement would be troublesome.

Mr. Tee challenges these lines of questioning as a denial of due process and equal protection. We reject these challenges.

23

## A.    Standard of Review

Mr. Tee did not object to the prosecutor's questioning of the venire. Thus, we consider the due-process and equal-protection challenges under the plain-error standard. *See United States v. Taylor*, 514 F.3d 1092, 1095-96 (10th Cir. 2008) (stating that when there is no objection, "our precedent limits us to plain error review"). "'Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Portillo-Vega*, 478 F.3d 1194, 1202 (10th Cir. 2007) (quoting *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005)). An error is plain when it is "clear" or "obvious." *United States v. Olano*, 507 U.S. 725, 734 (1993). And an error is clear or obvious only when "contrary to well-settled law." *Taylor*, 514 F.3d at 1100.

## B.    No Clear or Obvious Error

The government defends the questioning as an effort to check for possible prejudice against Asian-Americans. This explanation was plausible because of the nature of the evidence and the ethnicity of Mr. Tee, Lucy, and Jenny.

As Mr. Tee points out, the Constitution forbids the government from striking a venireperson based on race. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986) ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . ."). But the

24

prosecutor did not strike the Asian-American venireperson. Instead, the prosecutor simply asked about racial bias, and the Supreme Court has permitted questioning of venirepersons about racial bias. *See, e.g.*, *Turner v. Murray*, 476 U.S. 28, 36-37 (1986) (plurality) (holding that a defendant charged with an interracial capital crime is entitled to question venirepersons about racial bias); *Ristaino v. Ross*, 424 U.S. 589, 594-98 (1976) (stating that inquiry into racial bias can be required in certain circumstances); *Ham v. South Carolina*, 409 U.S. 524, 526-27 (1973) (concluding that the defendant's right to due process was violated by the state court's refusal to permit questioning about racial bias).

Against this backdrop, Mr. Tee fails to identify a single opinion condemning the sort of questioning that took place here. In the absence of any cited authority, we cannot regard the district court's failure to step in as an obvious constitutional error. *See United States v. Muñoz*, 812 F.3d 809, 815 (10th Cir. 2016) (rejecting an appeal point under the plain-error standard based on the appellant's failure to cite any supporting opinions). Thus, we reject this appeal point under the plain-error standard.

## IV. The district court did not err in allowing the prosecution to use the *Rubmaps* website as a demonstrative exhibit.

While talking with Lucy, Mr. Tee suggested that she use a website (*Rubmaps*) to research potential massage parlors. The district court allowed the prosecution to use screenshots from *Rubmaps* to help jurors understand

the nature of the reviews on this website. These screenshots were limited to

- the opening page,

- sample portions of the glossary, and

- two sample reviews.

Mr. Tee argues that the government's demonstration was improper for three reasons:

1. The jury perceived the *Rubmaps* screenshots as substantive evidence.

2. The *Rubmaps* screenshots were irrelevant.

3. The danger of unfair prejudice substantially outweighed any probative value.

These arguments fail, for the district court had the discretion to allow use of the screenshots to help the jury understand the sexual nature of the website.

**A.    Standard of Review**

We consider this evidentiary ruling under the abuse-of-discretion standard. *See United States v. Blechman*, 657 F.3d 1052, 1063 (10th Cir. 2011) ("'We review a district court's evidentiary rulings for an abuse of discretion, considering the record as a whole.'" (quoting *United States v. Ledford*, 443 F.3d 702, 707 (10th Cir. 2005))). Under this standard, we will reverse if the district court rules in a manner that is beyond "'the bounds of permissible choice'" or is "'arbitrary, capricious or whimsical.'" *United*

26

*States v. Willis*, 826 F.3d 1265, 1270 (10th Cir. 2016) (quoting *United States v. Sturm*, 673 F.3d 1274, 1286 (10th Cir. 2012)).

## B. The Jury's Understanding of the Screenshots as Substantive Evidence

Mr. Tee contends that the jury asked "whether there were any legitimate reviews on *Rubmaps*." Appellant's Opening Br. at 55. Mr. Tee argues that this question shows that the jury perceived the demonstration as substantive evidence. But Mr. Tee is mistaken about the question; it referred to *testimony* about *Rubmaps*: "What was the testimony in relation to legitimate massage businesses in Wichita being reviewed on Rubmaps.com?" Appellant's App'x at 74. We have no reason to think that the jury treated the *Rubmaps* exhibit as substantive evidence rather than as an aid to understand the testimony about the website.

## C. The Relevance of the Screenshots

Mr. Tee also challenges the use of the screenshots on the ground of relevance. We reject the challenge because the district court could reasonably view the screenshots as relevant to defeat Mr. Tee's entrapment defense. To counter this defense, the government needed to show Mr. Tee's predisposition to commit the offense. *See* Part II(B), above. This showing could come from Mr. Tee's experience in brokering the sale of massage parlors that sold sex as well as massages. To show this experience, the government presented evidence that Mr. Tee had suggested to Lucy that

27

she look for potential businesses through *Rubmaps*. But what was *Rubmaps*?

The government presented testimony about the sexual nature of *Rubmaps*, which served to counter Mr. Tee's theory of entrapment. For this theory, Mr. Tee had denied knowledge of sexual activity at the massage parlors. The government presented contrary testimony, but the district court could reasonably conclude that testimony alone would not fully explain the implausibility of Mr. Tee's alleged naiveté. The opening page of the *Rubmaps* website stated that here is where "fantasy meets reality." Appellant's App'x at 170. Then, a random sampling of four pages from the website's glossary contained explicit sexual terms that left little to the imagination. The two customer reviews were littered with explicit sexual terminology. And the website's standard review form allowed reviewers to specify whether the masseuse had offered certain services, including fellatio, intercourse, and other sexual acts.

With the insight gleaned from the screenshots, the jury could understand that Mr. Tee had prior experience working with massage parlors that sell sex. Consequently, the district court reasonably considered the screenshots as relevant.

### D.    The Danger of Unfair Prejudice

Mr. Tee also contends that the district court should have excluded the screenshots based on the danger of unfair prejudice.

28

This issue involves the application of Federal Rule of Evidence 403. This rule allows the district court to exclude evidence if the probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. We review the district court's ruling for an abuse of discretion. *United States v. Cerno*, 529 F.3d 926, 935-36 (10th Cir. 2008). And in reviewing the district court's exercise of discretion, we give the evidence its maximum reasonable degree of relevance and its minimum reasonable danger of unfair prejudice. *Id*. at 935.

The jury might have been shocked by the screenshots. But the screenshots allowed jurors to understand that *Rubmaps* is not a legitimate website with a few reviewers making inappropriate comments; *Rubmaps* is a website that targets individuals interested in hiring a prostitute. Therefore, when we assign the evidence its maximum reasonable degree of relevance and its minimum reasonable danger of unfair prejudice, we conclude that the district court acted within its discretion in allowing the use of the website as a demonstrative exhibit.

## V. The district court did not err in allowing introduction of Mr. Tee's *Backpage* advertisements.

Mr. Tee also challenges the introduction of prior advertisements posted on a website known as *Backpage*. The government presented evidence that (1) Mr. Tee had prepared these advertisements and (2) they had highlighted the sexual qualities of the massage therapists rather than

29

their ability to give legitimate massages. According to Mr. Tee, the exhibits constituted hearsay and were unfairly prejudicial. We reject both arguments.

## A.    The Advertisements

The exhibits comprised eight advertisements on *Backpage*; all were posted by Mr. Tee on behalf of Asian massage parlors. Each advertisement contained pictures of young, scantily clad Asian women in provocative poses, focusing on their physical attributes rather than their ability to give legitimate massages. The captions highlighted the masseuses' physical attributes and sexual qualities: "Beautiful and sweet Chinese therapists," "Cute & Hot Asian Girls Waiting For You," "Every Man's Fantasy," "Asian Hotties For U," and "Sexy Lady Must Come." Appellant's App'x at 199, 203, 209, 213, 215.

## B.    Hearsay

Mr. Tee contends that these advertisements constituted inadmissible hearsay. But Mr. Tee waived this contention.

Out-of-court statements can constitute hearsay if they are used to prove the truth of the matter asserted. Fed. R. Evid. 801(c). But at trial, Mr. Tee specifically disavowed any challenge to "the content" of the advertisements or "the substance" of whether Mr. Tee had placed the advertisements. Appellant's App'x at 391. Thus, Mr. Tee voluntarily relinquished any objection to the government's use of the advertisements

30

on hearsay grounds. In these circumstances, we consider the hearsay contention to be waived. *See United States v. Aptt*, 354 F.3d 1269, 1280-81 (10th Cir. 2004).[3]

## C.     Unfair Prejudice

Mr. Tee also contends that the probative value of the advertisements was substantially outweighed by the danger of unfair prejudice. According to Mr. Tee, the unfair prejudice came from the stereotype that Asian massage parlors engage in prostitution. But the government's evidence was based on experience rather than a stereotype. At trial, a police officer testified that "[t]he vast majority of parlors we investigate involve people who are of Chinese origin and speak Mandarin Chinese." Appellant's App'x at 422. This testimony lent significance to the nature of Mr. Tee's advertisements on *Backpage*, focusing on Asian massage parlors and the physical attributes of the masseuses.

The advertisements also tend to show Mr. Tee's predisposition through his prior work for prostitution fronts before he was contacted by

---

[3]     Even if Mr. Tee had not waived the hearsay contention, we would decline to consider it. Mr. Tee objected at trial based on relevance, not hearsay. Thus, even if he did not waive the hearsay objection, he failed to preserve it. *See United States v. Cornelius*, 696 F.3d 1307, 1319 (10th Cir. 2012). We would ordinarily consider an unpreserved challenge under the plain-error standard. *United States v. Battles*, 745 F.3d 436, 445 n.9 (10th Cir. 2014); *see* p. 17, above. But Mr. Tee has not urged plain error. As a result, we would decline to consider the hearsay contention even if it had not been voluntarily relinquished. *United States v. Lamirand*, 669 F.3d 1091, 1100 n.7 (10th Cir. 2012); *see* p. 17, above.

Lucy. The advertisements focus on the masseuses' physical attributes and sexual qualities rather than an ability to give legitimate massages. These advertisements could lead a reasonable jury to regard Mr. Tee as an entrepreneur experienced in selling houses of prostitution masquerading as massage parlors. Consequently, the district court could reasonably conclude that the danger of unfair prejudice had not substantially outweighed the advertisements' probative value. *See United States v. Al-Maliki*, 787 F.3d 784, 795 (6th Cir. 2015) (rejecting a challenge to evidence on the ground that it involved a Middle Eastern stereotype because the evidence, in context, was relevant and not unduly prejudicial).

## VI. Conclusion

We reject each of Mr. Tee's four appeal points. First, the government presented sufficient evidence for a reasonable jury to find guilt on each count and to reject Mr. Tee's defense of entrapment. Second, the prosecutor's questioning of the venire about potential bias against Asian-American individuals did not constitute plain error. Third, the district court did not abuse its discretion in allowing the government to present a demonstrative exhibit explaining the *Rubmaps* website. Finally, the district court did not abuse its discretion in admitting the *Backpage* advertisements. Having rejected each appeal point, we affirm the conviction.

16-3243, *United States v. Tee*

**McKAY**, concurring in part and dissenting in part.

I join the majority's opinion as to all issues except Mr. Tee's conviction for money laundering. On that count, I would reverse because Mr. Tee's charged conduct cannot constitute money laundering as a matter of law.

As an initial matter, it is important to reiterate what evidence the government presented at trial, and what evidence it did not present. According to the government's evidence, the police department provided Jenny with $100 in police department funds as part of its sting operation. Using the account information provided by Mr. Tee, Jenny took this $100 to a bank and deposited the funds into Mr. Tee's business bank account. That is the extent of the government's evidence about financial transactions involving the $100. The government presented no evidence that Mr. Tee conducted any further transactions with the $100 once Jenny deposited it into his account. Rather, the government contends that Mr. Tee laundered the $100 simply by instructing Jenny to deposit it into his bank account.

It is also important to clarify the government's theory on how the $100 constituted criminal proceeds, since the statutory language plainly states that an individual cannot be convicted of money laundering unless he conducts a financial transaction "which in fact involves the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1). The indictment specified that the unlawful activity which generated the $100 in criminal proceeds was Mr. Tee's use of a

telephone to promote prostitution; in other words, the $100 was criminal proceeds

because—and only because—it was paid to Mr. Tee for the help he had provided

to Jenny and Lucy in arranging the sale of a known prostitution front.  Thus, it

did not become criminal proceeds until the moment of payment; up until the point

when Jenny paid the money to Mr. Tee, the $100 was police department money

that (presumably) had not been illegally derived from criminal activity.

Given these facts, Mr. Tee's conduct cannot, as a matter of law, constitute

money laundering.  Several different circuits have all taken the position that

"[t]he transaction or transactions that created the criminally-derived proceeds

must be distinct from the money-laundering transaction, because the money

laundering statutes criminalize transactions in proceeds, not the transactions that

create the proceeds."  *United States v. Seward*, 272 F.3d 831, 836 (7th Cir. 2001)

(internal quotation marks omitted); *see also, e.g.*, *United States v. Butler*, 211

F.3d 826, 830 (4th Cir. 2000) ("Put plainly, the laundering of funds cannot occur

in the same transaction through which those funds first became tainted by

crime.").  Here, Mr. Tee was unquestionably convicted of money laundering

based on the same financial transaction that allegedly generated the criminal

proceeds.

Although this circuit has not applied this legal principle to a conviction

under § 1956 before, in *United States v. Johnson*, 971 F.2d 562 (10th Cir. 1992),

we considered an analogous issue involving similar statutory language for the

-2-

related crime of engaging in monetary transactions with criminally derived property in violation of 18 U.S.C. § 1957. The defendant in that case was convicted of sixty counts of violating § 1957 through a scheme in which he received funds from investors and periodically sent them smaller payments of purported profits, while withdrawing the rest of the funds for his own purposes. On appeal, we reversed all of the convictions that were based on the defendant's receipt of the investors' funds, while affirming the convictions that were based on his wiring of funds back to investors.

In so doing, we first noted that one could conceivably construe the statutory phrase "proceeds obtained from a criminal offense" more broadly than other courts had construed it. *Id.* at 569. As we explained:

> One might logically infer that Congress could have intended § 1957 to apply when the underlying criminal activity occurs simultaneously with a monetary transaction with the proceeds of the activity. In this case, the result achieved by causing the investors to wire the funds directly into the defendant's account was no different than if the defendant had first obtained the funds and then deposited them himself. This latter transaction would clearly have violated § 1957. It would be logical, then, to assume that the former transaction would also be proscribed by the statute. Yet, both the plain language of § 1957 and the legislative history behind it suggest that Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity. At the very least, the statute is ambiguous on this point because, after examining all the relevant material which might aid us in construing its provisions, a reasonable doubt persists as to the statute's intended scope. Accordingly, the "rule of lenity" requires that we adopt the more lenient interpretation.

*Id.* (citations omitted). We then held:

-3-

> Whether or not the funds that were wired to the defendant were "criminally derived property" depends upon whether they were proceeds obtained from a criminal offense at the time the defendant engaged in the monetary transaction. We find they were not. Section 1957 appears to be drafted to proscribe certain transactions in proceeds that have already been obtained by an individual from an underlying criminal offense. The defendant did not have possession of the funds nor were they at his disposal until the investors transferred them to him. The defendant therefore cannot be said to have obtained the proceeds of the wire fraud until the funds were credited to his account. Thus, the transfers alleged in counts four through thirty-one of the indictment were not transactions in criminally derived property and the defendant's convictions on those counts are reversed.

*Id.* at 569–70. We noted that this interpretation of § 1957 was consistent with our discussion of § 1956 in an earlier case, in which we "concluded that 'Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior specified unlawful activity.'" *Id.* at 569 (quoting *United States v. Edgmon*, 952 F.2d 1206, 1214 (10th Cir. 1991)).

The same reasoning is applicable in this case. Mr. Tee's money-laundering conviction cannot be sustained because, until the financial transaction had been completed and the funds came into his control and possession, the $100 did not constitute "proceeds" of criminal activity, and there is no evidence that he engaged in any financial transactions with the $100 once it was deposited into his account and thus became criminal proceeds. *See id.* at 569–70; *see also, e.g.*, *Seward*, 272 F.3d at 837 ("[T]he defendant must have control of the proceeds of a

fraudulent transaction before he can engage in money laundering with those proceeds."). While Congress could perhaps have drafted the statute "to apply when the underlying criminal activity occurs simultaneously with a monetary transaction with the proceeds of the activity," 971 F.2d at 569, it did not unambiguously do so, and the statute accordingly must be construed to proscribe only financial transactions that occur after the transaction that generates the criminal proceeds has been completed. *See id.*; *see also, e.g.*, *Seward*, 272 F.3d at 836. Mr. Tee's conviction clearly violates this well-settled principle of law.

The majority is of the view that we need not address this issue because, both before the district court and on appeal, Mr. Tee has failed to raise this nuance of the law in his challenge to the government's evidence of money laundering. I respectfully dissent. The question of whether the government's evidence was sufficient to sustain his money-laundering conviction is clearly at issue in this appeal: Mr. Tee has raised two different arguments to challenge the government's theory of the case, and the government has contended in response that the $100 constituted proceeds of Mr. Tee's illegal activities and that Mr. Tee laundered his criminal proceeds by "provid[ing] Jenny his Alert America business account in order to disguise the nature and source of the proceeds." (Appellee's App. at 22.) I believe it is the duty of this court to resolve the issues before us correctly, even if they have not been briefed well by the parties. Moreover, even if Mr. Tee's arguments on appeal were insufficient to raise this specific legal

challenge to his conviction, I believe the circumstances of this case warrant an exercise of our discretion to consider this issue and resolve it correctly.

The Supreme Court has held that there are certainly "circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt or where injustice might otherwise result." *Singleton v. Wulff*, 428 U.S. 106, 121 (internal quotation marks and citations omitted). It is difficult for me to conceive of a situation in which injustice is more likely to result than when this court will let stand a conviction for conduct which is not criminal as a matter of law, on the slim ground that the defendant did not argue a particular nuance of the law in contesting his criminal conviction.

Nor do I see any doubt as to the proper resolution of this case. The majority's attempts to distinguish this case from *Johnson* are unpersuasive. For instance, the majority argues that *United States v. Kennedy*, 64 F.3d 1465 (10th Cir. 1995), stands for the proposition that money-laundering convictions under § 1956, unlike money-laundering convictions under § 1957, may be sustained even where the supposed money laundering occurred in the same financial transaction that caused the money to become criminal proceeds. However, nothing in *Kennedy* is inconsistent with the reasoning or result of *Johnson*. In *Kennedy*, the § 1956 counts were each based on the defendant's action of depositing funds he had previously received from defrauded investors into his

account; thus, his receipt of the profits of his criminal activities occurred prior to the financial transactions that gave rise to his money-laundering convictions. *See id.* at 1477. As we noted in *Johnson*, "the result achieved by causing the investors to wire the funds directly into the defendant's account [as occurred in *Johnson*] was no different than if the defendant had first obtained the funds and then deposited them himself [as occurred in *Kennedy*]." 971 F.2d at 569. And yet, while the latter transaction "would clearly have violated § 1957" or § 1956, the former transaction does not. *Id.* "[T]he money laundering statutes"—both § 1956 and § 1957—"criminalize transactions in proceeds, not the transactions that create the proceeds." *United States v. Seward*, 272 F.3d 831, 836 (7th Cir. 2001). Our holding in *Kennedy* is in accordance with this settled legal principle.

Perhaps the majority is of the view that affirming Mr. Tee's money-laundering conviction despite its lack of a permissible legal foundation is unimportant because it is just one of three counts Mr. Tee was convicted for and because he has already completed his concurrent 18-month sentence on these counts. I cannot agree with such reasoning.

First, such an argument would "incorrectly assume[] that the total sentence imposed is all that matters, and that the number of convictions that can be obtained is of no relevance." *Missouri v. Hunter*, 459 U.S. 359, 371–72 (1983). This argument "overlooks the fact that, quite apart from any sentence that is imposed, each separate criminal conviction typically has collateral consequences,

. . . [and t]he number of convictions is often critical to the collateral consequences that an individual faces." *Id.* at 372–73. Moreover, "[b]ecause a criminal conviction constitutes a formal judgment of condemnation by the community, each additional conviction imposes an additional stigma and causes additional damage to the defendant's reputation." *Id.* at 373.

Second, by affirming a criminal conviction for conduct that as a matter of law is not criminal, the majority muddies an already complicated area of law and substantially increases the risk of further instances of prosecutorial overreach. The majority expressly holds that the $100 constitutes proceeds of an unlawful activity because a jury could find that it was paid to Mr. Tee for brokering the sale of the prostitution business, and the majority further holds that the money-laundering conviction may be upheld on the basis that Mr. Tee directed Jenny to deposit the $100 into his bank account. Although the majority then notes that it is declining to address the issue of whether money-laundering convictions may be based on the same financial transaction that created the criminal proceeds, the majority's opinion may be misread in the future as allowing convictions to be so based, deviating from this court's precedent in *Johnson* and creating a split from the well-settled law in our sister circuits.

Third, affirming a criminal conviction for conduct that is not criminal under the charged statute "seriously affects the fairness, integrity[, and] public reputation of judicial proceedings," regardless of whether the conviction affected

the total sentence or not. *United States v. Olano*, 507 U.S. 725, 732 (1993) (internal quotation marks and brackets omitted). In my view, affirming a criminal conviction for non-criminal conduct based on defense counsel's procedural forfeiture of a nuanced legal argument is unfair, unjust, and will erode public trust in the judiciary.

I would exercise this court's discretion to consider the legal foundations of Mr. Tee's money-laundering conviction and hold as a matter of well-settled law that his conviction must be reversed because the purported money laundering occurred in the same transaction in which the funds became criminal proceeds. I therefore dissent from this portion of the majority's opinion.